# A. M. BROWN *v*. C. P. IAUKEA.

ORIGINAL.

TRIED Nov. 26, 27, 28, 30, Dec. 1, 3, 4, 5, 10.
DECIDED DEC. 11, 1906.

FREAR, C.J., HARTWELL AND WILDER, JJ.

ELECTION CONTEST—*not a recount, allowed by statute.*

The statute relating to county elections does not permit a recount as such. It provides merely for a contest, to sustain which the petitioner should allege of his own knowledge or on information and belief and not as mere guess-work, facts sufficient to change the result of the election

BALLOTS AS EVIDENCE—*must have been kept safely.*

Before being admitted as evidence, ballots cast at a county election should be affirmatively shown to have been kept in their original condition.

BALLOTS—*classes of, held valid.*

The following classes of ballots are valid, when the defects mentioned are inconspicuous or appear to be the result of accident, carelessness, ignorance or want of skill or not of evil intent: ballots marked with an instrument other than a lead pencil; ballots on which the crosses are imperfectly formed, as when the lines are irregular or repeated or have small hooks at the ends of the arms, or when the lines are of varying lengths so as to give the cross the appearance of a V or T or Y, or when the cross has the appearance of a figure 4; ballots on which the lines of the cross are perpendicular and horizontal instead of oblique, or on which the crosses are unusually heavy or one of which is unusually heavy, or in which there are small punctures; ballots on which there are small dots or other marks near the crosses; or on which there are other accidental irregular indefinite marks; ballots on which crosses have been made and well erased; ballots on which there are impresses of other crosses, the result of marking one ballot on top of another or of marking on a colored shelf or of folding after marking with a soft pencil; ballots on which the cross marks are substantially though not entirely within the proper space.

ID.—*classes of, held invalid.*

The following classes of ballots are invalid: ballots on which a cross is not in a proper place, as when it is on the left of the name or in the name space or to the right of a blank space; ballots on which there are marks that might be regarded as distinguishing marks, such as a single line left after starting to make a cross in a proper place and not completing it, or small dots or other marks made in checking off names not voted for, or a heavy line made under a cross for emphasis; ballots on which there are conspicuous erasures, or through which there is a large hole caused by repeated rubbing with a pencil. A voter who spoils his ballot should surrender it and obtain another.

ID.—*may be counted for one class of officers though too many of another class voted for.*

A ballot marked for too many of one class of officers is not thereby invalidated as to other classes.

ID.—*county officers of all classes to be on one ballot.*

The county act requires the names of candidates for all classes of county officers elected at one election to be placed on the same ballot.

### OPINION OF THE COURT BY FREAR, C.J.

(Wilder, J., Dissenting.)

This is an election contest instituted under chapter 11 of the county act (L. 1905, act 39) by the republican candidate for sheriff of the county of Oahu, who claims that he was elected at the general election held November 6, 1906, although he was returned as having received only 2721 votes while his only opponent, the democratic candidate, to whom the certificate of election was issued, was returned as having received 2735, a majority of 14.

The petitioner alleged generally that there were cast 220 legal votes for him which were not counted, that 160 illegal votes were counted for his opponent, and that but for these errors he would have received a majority of more than 350. He also made specific allegations as to the number of legal votes not counted for him and illegal votes counted for his opponent in each of the 10 precincts of the 4th representative district and the 13 precincts of the 5th representative district, which comprise the county. He further alleged that all such acts

were done by the election officers with the intent and purpose of holding an undue election and with the desire to prevent an honest expression of the popular will in said election. The petition was sworn to of his own knowledge except as to matters stated on information and belief, but none of the allegations purported to be on information and belief.

The allegations being such as to indicate that the petition had not been prepared with due care, the court inquired at the outset whether the petitioner meant to swear to all of the allegations of his own knowledge. His counsel replied in the negative and requested leave, which was granted, to amend the petition so as to make the allegations as to votes upon information and belief. Inquiry was made further as to whether the petitioner intended to allege actual fraud on the part of the inspectors of election, some 69 in all in the various precincts. His counsel replied in the negative as to this also and asked leave, which was granted, to amend by striking out the paragraph upon that subject. When the ballots of the 1st precinct of the 4th district had been put in evidence and disclosed a state of facts so variant from the allegations in regard to that precinct as to indicate, in connection with the allegations of the petition as a whole and what had occurred up to that point in the trial, that the allegations might not have been founded even on information and belief, the court, taking the position that the statute did not permit a recount as such or a mere fishing expedition undertaken in the hope that in an examination of all the ballots enough might be discovered to change the result, declined to proceed further unless the petitioner should show that he had actual information of mistakes or errors sufficient to change the result. The petitioner thereupon took the stand and very frankly gave testimony which showed that as to all but two precincts his allegations had been a matter of guesswork; but he did show that in those two precincts, if his information was correct, errors had been committed to an extent sufficient to change the result provided other errors were not also committed which would operate against him or in favor

of his opponent. He also showed that he had some information as to two other precincts but of a kind or in regard to matters that would not aid him under the allegations of his petition.

The court then proceeded with the two precincts with regard to which the petitioner had definite information and found that errors had been made by the inspectors of election adversely to him to such an extent as, taken by themselves, would affect the result, although other errors also were discovered which still left his opponent in the lead but with a smaller majority. A majority of the court then held that the petitioner had made out a prima facie case and that the other information obtained from an examination of all the ballots in those precincts was in the nature of defense and rebuttal,—the ballots being examined for all purposes, namely, the petitioner's case, the defense and rebuttal at the same time for convenience instead of at several times for the purposes of the theoretically successive stages of the case—and that the petitioner might proceed in order to show if possible that other errors had been committed against him, the corrections of which would offset the errors discovered by the respondent.

The respondent objected to the introduction of any of the ballots in evidence until it was shown affirmatively that they were in the same condition in which they were when they were cast and when they were deposited by the inspectors with the county clerk, their legal custodian. This was done to the satisfaction of the court notwithstanding that an assistant clerk in the county clerk's office, who was also an assistant clerk of the republican county committee, which was composed largely of special adherents of the petitioner, and whose chairman was the clerk of the petitioner, who is the present county sheriff, also had access to the ballots by reason of knowing the combination and having a duplicate key of the safe in which they were kept. The respondent, however, was permitted to show, if he could, that the ballots had actually been tampered with, but the introduction of such evidence was postponed until after all the packages of ballots had been presented and opened so as to

give the inspectors of the various precincts an opportunity to examine and observe their condition in order to see whether that was the same as when they had done up and sealed the packages. Evidence upon this point was introduced towards the close of the case but with reference to only two precincts, as it was with reference to those alone that the facts disclosed upon opening and counting the ballots seemed to warrant an attempt to show that the ballots had been tampered with. The court now holds upon the entire evidence on this subject that the ballots were in the condition in which they were when deposited with the county clerk and that they had not been tampered with. We cannot refrain from saying, however, that too great care cannot be exercised in preserving ballots as prescribed by law so that there may be no question as to their genuineness; and, especially in view of the facts in this case, that no one so closely identified in interests with one of the candidates or the committee conducting his campaign as the assistant clerk in question should be permitted to have access to the place in which the ballots are kept. We may observe further while upon this subject that there is no evidence whatever of fraud or attempted fraud on the part of the petitioner or any of the inspectors or other officers having anything to do with the election or, so far as disclosed by the ballots, on the part of any voter. There is no indication whatever that a single vote was actually marked for the purposes of identification or voted in a particular way in consequence of intimidation or improper inducements, or otherwise except in the exercise of the voter's free choice.

The returns of the inspectors of election showed that the respondent, Mr. Iaukea, received 2735 votes and the petitioner, Mr. Brown, 2721, a majority of 14 for Mr. Iaukea, but an examination of the ballots showed that mistakes had been made by the inspectors of seven precincts in counting the ballots held good by them. They failed to credit Brown with 13 votes which they held valid and credited him with 1 too many. They failed to credit Iaukea with 5 votes which they held valid and

credited him with 1 too many. Applying these corrections the figures returned by the inspectors should be modified on their own rulings so as to give Iaukea 2739 votes and Brown 2733, a majority of 6 for Iaukea to start with in this contest.

In passing upon the ballots counted by the inspectors the court considered only those which were challenged by counsel on one side or the other. Several hundred were thus challenged. The court passed upon them precinct by precinct, stating however that the rulings were only of a preliminary nature and were subject to revision in the light of further knowledge after the conclusion of the examination of the ballots of all the precincts. Of the ballots challenged, the court rejected preliminarily 55 that had been counted for Iaukea and 48 that had been counted for Brown, a net gain of 7 for Brown, which overcame Iaukea's original majority of 6 by 1 vote. Upon going over these again since the close of the evidence, the court holds that certain classes of the ballots rejected preliminarily should be counted, and the application of this ruling shows that 20 of these should be counted for each candidate thus producing no change in the result and leaving Brown with a majority of 1.

On the preliminary examination of the ballots rejected by the inspectors, counsel challenged none on either side excepting that counsel for the respondent early in the case took the position that ballots upon which too many names were marked for officers of one class and which had been rejected by the inspectors solely on that ground should be counted for officers of other classes for which only the proper number of names had been marked, and this question was reserved for argument and decision at the close of the evidence. A majority of the court held finally that such ballots were valid as to officers properly marked and invalid only as to the classes of officers directly affected. Counsel were then asked to examine the ballots rejected by the inspectors for the purpose of ascertaining how many of this class had been cast for the respective candidates. It was found that 153 of this class had been cast for Iaukea and rejected by the inspectors which, with 4 of the same class

counted by the inspectors but preliminarily rejected by the court, made 157 for Iaukea; and that 117 had been cast and rejected and none counted by the inspectors for Brown, thus giving Iaukea a gain of 40 and a majority of 39.

In examining the ballots rejected by the inspectors for the purpose just mentioned counsel for the respondent discovered one vote which they had overlooked in the preliminary examination which should be counted for Iaukea, thus overcoming Brown's majority of one and leaving the candidates even irrespective of the class of votes just referred to, and giving Iaukea a net majority of 40, including that class.

To sum up, starting from the inspectors' standpoint, the inspectors counted for Iaukea 2735 but made mistakes of 5 in one direction and 1 in the other, which made his total 2739 on the inspectors' showing. The court counted for him 154 of the 196 votes rejected by the inspectors and rejected 31 counted by the inspectors, giving him a net gain of 123 or a total of 2862. The inspectors counted for Brown 2721 votes and made mistakes of 13 in one direction and 1 in the other, which made his total 2733 on the inspectors' showing. The court counted for him 117 of the 149 which the inspectors rejected, and rejected 28 that the inspectors counted, making a net gain of 89 and a total of 2822, thus making Iaukea's majority 40.

To sum up differently, from the standpoint of the court, there were cast at the election for county officers in this county 6256 votes. Of these 439 were not marked for either candidate for sheriff or, in a few instances, were marked for both and therefore could not properly be counted for either. This leaves 5817 cast for one or the other of these candidates, of which 2935 were cast for Iaukea and 2882 for Brown, making a majority of 53 for Iaukea. Of those cast for Iaukea 73 are rejected and of those cast for Brown 60 are rejected, leaving Iaukea with 2862 and Brown with 2822, a majority of 40 for Iaukea.

In ruling upon the ballots the court construed the statute liberally in favor of the voter and very few, if any, votes were rejected for any cause which might not easily have been avoided

by any reasonably intelligent voter and the counting of which would open the door for fraud in future elections. Indeed one class of ballots was counted for the reason that it could not be excluded under the terms of the statute in the absence of anything to show a fraudulent intent but which ought to be excluded in order to prevent fraud in the future. This was the class of ballots marked with other instruments than lead pencils, as, for instance, in ink, or in green, blue or purple colored pencils. There were eight of these, four for each candidate. The statute does not prescribe with what instrument the mark should be made. Perhaps it should do so just as statutes elsewhere often do by prescribing, for instance, that the mark should be made with a black-lead pencil. We do not mean to imply that even under the present law ballots of this class could not be rejected if it should appear with sufficient clearness from a series of ballots of this character or in any other way that they were marked so for the purpose of distinguishing or identifying them.

Among the other classes of ballots challenged by counsel but allowed to be counted by the court were ballots upon which the cross marks were imperfectly made, as where the lines were irregular or repeated or had small hooks or curves at their ends or when, owing to failure to make the lines long enough, the cross had the general appearance of a V or a T or a Y, or, owing to failure to lift the pencil sufficiently before marking the second line, had the appearance of a figure 4, when it was evident from inspection that a cross and not one of these other characters was intended. Ballots also were counted in which the crosses were substantially in the proper space, although its arms extended beyond the space; also ballots in which the lines of the crosses were perpendicular and horizontal respectively instead of oblique as in the letter X; also ballots on which the crosses were unusually heavy or one of which was unusually heavy, or in making which a small puncture was made through the paper. Ballots also were counted on which there were impresses of crosses caused by marking a ballot for territorial officers on top of a ballot for county officers; such impresses

were found on the face of some ballots and on the back of
others; in some instances the impress was merely an indentation
on one side or projection on the other side, while in other
instances it had a color apparently taken from the color of the
shelf on which the ballot was laid; similarly ballots were
counted upon which there was an impress of a cross, known
as an offset, produced on one part of the face of the ballot from
contact with a cross properly made on another part, when the
ballot was folded. Ballots were counted upon which crosses
had been made and afterwards erased when the erasure had
been done so that it was not readily discernible. Ballots were
counted also which had other marks upon them, such as small
dots or other marks near the crosses evidently the result of
unsteadiness or want of skill in handling a pencil, and other
marks of an irregular or indefinite character on various parts
of the ballot obviously the result of accident caused by careless-
ness in permitting the pencil to come into contact with the
ballot when handling the two together.

The principal classes of ballots that were rejected were bal-
lots on which the crosses were on the left of the candidates'
names, or in the name space itself, or in the space opposite the
blank space provided at the foot for writing in the name of a
candidate under certain circumstances,—instead of being in the
space prescribed by law at the right of the candidate's name;
ballots on which there were other marks which might be
regarded as distinguishing marks, such as lines of more or less
definite character apparently not the result of accident, such as
a heavy short mark or longer mark in a proper space for mark-
ing a ballot, apparently the result of starting to make a cross
and then abandoning the idea of voting for the candidate whose
name was opposite, or small dots or check marks extending in
a line down the whole or a part of the ballot, perhaps made by
the voter in checking off the names of persons not voted for,
or, in one instance, a heavy line with a heavy dot in the middle
of it made under one cross, perhaps for emphasis; ballots upon
which there were conspicuous erasures, and, in one instance,

in which a large hole was worn apparently by continued rubbing with the point of the pencil. The statute prescribes the course to be pursued in the case of a spoiled ballot. It is to return the ballot to the inspectors and procure another.

After the preliminary examination of the ballots, which showed a majority of one for Brown, the respondent offered to prove that one person had voted for Brown, notwithstanding a protest made at the time to the inspectors of election, who was disqualified from voting by reason of having been convicted of an offense punishable by imprisonment for more than one year and not having been pardoned or restored to his civil rights; also that another person had voted for Brown who was disqualified by reason of not having attained the age of 21 years. The court, however, declined to admit the evidence. The registration list is conclusive on the right of a person to vote (Rev. L., Secs. 54-58) and the only way to change the registration list is by application to the board of registration or by appeal from the decision of the board to the supreme court. Rev. L., Secs. 47, 50-53, 55-58. The statute makes no provision for challenging voters at the polls. The result if one obtains registration illegally is not to cause his vote to be rejected but to subject him to the penalties prescribed for perjury or other offenses under the election laws. Rev. L., Secs. 49, 63, 107-112. The organic act, it is true, prohibits persons of the classes now in question from voting but the same act also provides for the system of registration.

The principal question, therefore, upon which the case depends is whether ballots properly marked for a certain class of officers, but upon which too many persons are voted for of another class, should be rejected as a whole or only as to the class directly affected. Eight classes of county officers are voted for at a general county election—if we regard supervisors at large and district supervisors as belonging to different classes for purposes of election inasmuch as the names of candidates of each class have to be arranged separately on the ballot. They are supervisor at large, district supervisors, sheriff, deputy

sheriff, clerk, auditor, attorney and treasurer. The county act does not contemplate that there should be eight separate ballots for these officers and therefore does not support the argument that the eight parts of the ballot actually used should be regarded as so many different ballots and that the invalidity of one should not affect the others merely because through some mistake they happened to be attached or placed on one piece of paper. The county act (Sec. 38) provides that, "The ballots shall be of green paper and their general form, arrangement, number and style of printing shall be as prescribed by law for ballots for senators and representatives," and (Sec. 54) that for the first election "such ballots shall be white in color and of uniform size, shape and thickness;" also (Secs. 37, 54) that the ballot boxes for both the first and subsequent elections shall be marked "County Officers." Ballots for senators under the general election law (Rev. L., Sec. 70) are required to be of blue paper and ballots for representatives of white paper and the ballot boxes for these classes of officers are required (Sec. 67) to be marked "For Senators" and "For Representatives" respectively. We could hardly ascribe to the legislature an intention to require eight different ballots cast at the same election to be of the same color or to be deposited in eight different boxes all marked the same way. Taking the two requirements together—the uniform color of the ballots and uniform marking of the boxes—the absurdity of holding that more than one ballot or one box for county officers at one election was intended is evident, for if there were eight ballots of the same color and eight boxes marked the same way it would be impossible for the inspectors to know into which box to put any particular ballot unless they opened the ballot to see for which class of officers it was cast and thereby destroyed its secrecy, and unless they also remembered for what class of officers each box was intended and deposited the ballots in the boxes accordingly without reference to their markings. But the fact that only one ballot is contemplated for all county officers is not of itself sufficient to show that voting for too many officers of

one class should exclude votes properly indicated for officers of other classes. The solution of that question depends upon the provisions of the general election law. The county act makes some special provisions for elections of county officers and provides generally (Sec. 29) that, "The general laws and rules governing the election of senators and representatives of the Territory shall apply in the election of county officers wherever applicable except as herein provided."

The provisions of the general election law upon the point in question are found in Rev. L., Sec. 94, which reads as follows:

"If more names are voted for on a ballot than there are offices to be filled; or,

"If on a ballot for representatives a larger number of votes are marked than the law authorizes; or,

"If a ballot contains any mark or symbol whereby it may be identified, or any mark or symbol contrary to the provisions hereof; or,

"If two or more ballots are found in the ballot box so folded together as to make it clearly evident that more than one ballot was put in by one person; or,

"If a ballot in any other way be contrary to the provisions hereof; then such ballot and all it contains must be rejected.

"But no such ballot shall be rejected for containing a less number of names voted for than the law authorizes.

"Each ballot which shall be held to be invalid as aforesaid shall be indorsed on the back by the chairman of inspectors with his name or initials, and the word 'rejected.' "

The only parts of this section that might possibly be applicable upon this point are the first, second, third and fifth paragraphs.

The second paragraph was inserted originally with reference to the system of cumulative voting which was then (1894) in vogue for representatives and may now be regarded as retained by oversight and as wholly inapplicable to any elections for want of a subject to which it may apply, or else as surplusage, if it may be applied now, for, as applied to the present system of voting, it adds nothing to the preceding paragraph.

The first paragraph is the one chiefly sought to be applied. This paragraph was framed and inserted originally with refer-

ence to elections for senators and representatives, which were the only elections then held and for which there were separate ballots, each of which contained the names of only one class of candidates. No such ballot as is now required for county officers of different classes was contemplated at that time. There was no occasion for framing this paragraph as corresponding paragraphs inserted in election laws elsewhere with reference to ballots for more. than one class of officers are framed—so as to provide in substance that if more names are voted for for any class of officers than there are offices of that class to be filled the ballot shall not be counted for officers of that class. How far should this clause be applied to the new conditions with reference to which it was not enacted, and its application to which in the mode contended for by the petitioner evidently was not contemplated by the framers of the county act and would result in nullifying the votes of 274 voters for various classes of officers cast at the election in question and would in all probability similarly affect numerous votes at subsequent elections? The question is not the same as it would be if this clause had been enacted with special reference to county elections. It is merely a question of construction as to how far it is applicable to county elections under a general provision that the general election law should apply to such elections but only so far as applicable. If this paragraph is applied literally to ballots for county officers and in the same sense precisely in which it was intended to apply to ballots for senators and representatives, it means that a ballot should be rejected only when more names are voted for on the entire ballot than there are offices to be filled at the entire county election; that is, if too many supervisors, for instance, are voted for but too few of other classes of officers are voted for, so as to leave the aggregate of all classes voted for not more than the aggregate of all offices to be filled, the ballot would be good, while if the voter should similarly vote for too many supervisors but fail to omit to vote for some other officers, with the result that the aggregate number voted for of all classes exceeded the aggregate number

that might properly be voted for, the ballot would be bad. Such a construction would be absurd. Moreover, under this literal construction many of the ballots of this class would be in conformity with the law, for in many instances the total number of all classes voted for does not exceed the total number that might be voted for. If, on the other hand, this paragraph could be applied distributively so as to refer to the several parts devoted to the respective classes of officers on the county ballot —just as the provision in the county act that the arrangement of the ballot should be the same as that of a ballot for senators or representatives would require the names of the candidates in each class to be arranged alphabetically by themselves and would not require the names of candidates of all classes on the entire ticket to be so arranged together—then the portion set apart for each class of officers on the county ballot should be regarded independently of other portions and as constituting a separate ballot for the purposes of this statute, and that part alone would be invalidated by a vote in it for too many names; the statute provides merely that "such ballot" must be rejected. And yet there are difficulties in the way of such a construction, for that would require the word "ballot" to be construed in one sense in one paragraph and in another sense in another paragraph in the same section. It would make the word ballot mean the portion devoted to a particular class in the first paragraph and mean the whole in the third paragraph, for instance; moreover, under the last paragraph it would require the inspectors to write the word "rejected" on the back of the portion or portions on which too many names were voted, leaving the ballot good as to other portions, which could hardly have been intended. A third construction of the first paragraph, which is perhaps the only construction that would favor the petitioner, would be to treat the clause as distributive so far as voting for too many names is concerned and as applying to the whole ballot so far as invalidating it is concerned; in other words, to· combine the first two suggested constructions just referred to. But to do this it would be necessary to read other words into

the provision so as to make it read somewhat as follows: "If more names are voted for *for one class of officers* on a ballot than there are offices *of that class* to be filled, then *the whole of* such ballot and all it contains must be rejected." That would be for the court to inject words into a statute in order to make it mean as applied to new conditions what it could not have meant when originally enacted and to produce a result that could not have been intended by the legislature which created the new conditions and that would be destructive of the voting privileges of large numbers of citizens. That should not be done in the absence of a clear indication that such a result was intended. It is true there is one case that points in the other direction, namely, that of *Deloatch v. Rogers,* 86 N. C. 357. In that case the view expressed was mere dictum, not necessary for the decision of the case, as the court itself recognized; the clause in question was worded differently although much the same in substance, and the statute as a whole was framed on a different theory; and yet it cannot be denied that the case points strongly in the other direction as far as it goes. The statute there, however, was enacted with direct reference to ballots covering several classes of officers and could not be given any effect whatever unless construed in that way, while here the statute was passed with reference to ballots covering only one class of officers and is still applicable and effective as to such ballots and is merely a part of a general election law which by a general clause is made applicable to the class of ballots now in question only in so far as it, the general law, is applicable. In that case the court held that it could not read certain words into one part of the statute, but apparently it was obliged to read other words into another part in order to make it mean what it was held to mean and in order to make it effective for any purpose. In the present case there is no necessity for reading words into the statute in order to give it effect and much reason for not doing so in order to prevent its having a meaning which could not have been intended and would produce disastrous results.

But is not a vote for too many names of one class a mark or symbol whereby the ballot may be identified or a mark or · symbol contrary to the provisions of the statute within the meaning of the third paragraph of this section? This paragraph must receive, and has universally received, both here and elsewhere, a liberal construction in order to avoid depriving citizens of the voting franchise through no fault of theirs, although a sufficiently strict construction to effectuate the purpose of an election law of this character by preserving the secrecy of the ballot. This is exemplified by the rulings above referred to in the present case, which show that it is not every mark or symbol by which a ballot may be identified or which is contrary to the provisions of the statute that invalidates it. The question of the intent of the voter and the spirit of the provision qualifies its literal meaning. In itself a vote for too many is no more a distinguishing mark than a vote for fewer than the law allows. The difference is that in one case the vote cannot be counted while in the other it can be, but one is as much a symbol of identification as the other. Even when too many are voted for the vote for each taken by itself is perfectly proper and in strict accord with the statute, and the only reason why it cannot be counted is because there are so many votes all equally good that it is impossible to say for which of the candidates they should be counted. It is also extremely improbable that too many names in one class would be marked for the purpose of identification, for that would deprive the voter of his vote as to all officers of that class. It is at least a question whether the blanket clause referring to marks and symbols contrary to the provisions of the statute should be given a broader meaning than that which relates to marks and symbols whereby the ballot may be identified. In *Dennis v. Caughlin,* 22 Nev. 447, the statute provided that "Any ballot upon which appears names, words or marks written or printed, except as in this act provided, shall not be counted." The court said that the statute was less liberal in its terms than statutes of other states, and that if its provisions relating to marks were

to be literally enforced many voters would be disfranchised, and held that it should be read as if it had attached to it the qualification that if a mark satisfactorily appeared to have been made inadvertently or accidentally and not for an evil purpose it was not within the meaning of the statute and that the broad provision quoted should be construed practically as a provision against identifying or distinguishing marks. Moreover, the blanket clause now in question refers to marks and symbols "contrary to the provisions hereof," meaning the provisions of the general election law, and there is no express provision in that against voting for too many. There is, it is true, a provision in the organic act, which by reference incorporates the general election law, as to how many senators and representatives respectively one *may* vote for, but that cannot apply to county officers and there is not even such a provision in the county act as to county officers. Of course, on general principles no more persons can be voted for than there are offices to be filled, but that is not by reason of prohibitory clauses in the statute. It is by general law and for the reason that such a vote could not be given effect because it would be impossible to ascertain for which of the excessive number of names voted for the vote should be counted. Further, the section itself provides separately in the first paragraph for the case of voting for too many names as if that were not deemed by the legislature to be included among the marks and symbols referred to in the paragraph in question. In support of these views, see *Day v. Dunning,* 127 Cal. 55; *Borders v. Williams,* 155 Ind. 36; *State v. Sadler,* 25 Nev. 131, although these decisions are not precisely in point inasmuch as the statutes differed in some respects from ours. The fact, if it is a fact, that the first paragraph of this section does not apply to county elections, cannot be urged against this view on the theory that if it does not apply to such elections it cannot affect the construction of the third paragraph, which does apply, for the latter must apply in the sense in which it is used with reference to senatorial and representative elections to which the first paragraph does apply.

Moreover the first paragraph, as well as its counterpart, the sixth paragraph, is merely a statement of what the law would be irrespective of the statute.

The fifth paragraph of this section, which is the only paragraph remaining that could possibly have any application, may be disposed of on the same reasoning as the blanket clause in the third paragraph, and the additional reason that by its terms it contemplates only such cases as are contrary to the provisions of the statute in some "other way" than those already mentioned, including that of voting for too many.

This court a little more than a year ago ruled during the course of the trial in the case of *Fernandez v. Adams* that the entire ballot was invalid. That ruling, however, was made without the aid of much, if any, argument by counsel and was never reduced to writing or reported, the case having been discontinued by the petitioner. On these grounds and others there is not the same reason for adhering to it as there is for adhering to many other classes of decisions. It is not like a decision upon the faith of which vested rights have been acquired, and which, therefore should not be disturbed except for very weighty reasons, or like a decision on a question of practice which often should not be disturbed for. the very reason that it is a mere question of practice in regard to which it might be of no great consequence which way the practice is and of greater consequence that it should be certain and uniform than that it should be the best. It was a decision the reversal of which on the one hand can affect only the future and on the other will seriously affect the very important matter of the elective franchise of large numbers of citizens. If incorrect it should be reversed for the purpose of giving effect to those important privileges.

Counsel for the petitioner having been permitted upon request to reargue the question as to ballots on which too many names had been voted for of one class, after the opinions of the justices had been informally announced upon that question, the majority of the court see no reason for altering the foregoing

views. The case of *Duvall v. Miller,* 94 Md. 697, cited on the reargument is not in point. Not to mention other points of difference, the statute contained express language indicating that if more persons were voted for of one class the whole ballot should be rejected. In this connection it is interesting to note that the earlier statute in Maryland had been more like ours, for it provided that "If upon opening any of the said ballots there is found any more names written or printed on any of them than there ought to be   *   *   *  , such ballot shall be rejected and not counted;" and yet it had for 85 years been uniformly construed as meaning that the ballots on which too many names had been voted for one class of officers should be rejected as to that class only, and this fact was relied on by counsel, including Charles J. Bonaparte, as a reason why the court should hold the same way even under the statute as amended, but the court held that the amendment clearly required a different construction.

The judgment of the court is that the respondent was elected sheriff of the County of Oahu at the election held on November 6, 1906, for the term beginning at 12 o'clock noon on the first Monday in January, 1907.

*G. D. Gear, J. J. Dunne* and *E. A. Douthitt* for petitioner.

*W. A. Kinney, W. S. Edings, W. A. Whiting* and *J. Lightfoot* for respondent.

### CONCURRING OPINION OF HARTWELL, J.

The provision of the county act that "the general laws and rules governing the election of senators and representatives of the Territory shall apply in the election of county officers wherever applicable except as herein provided" (Sec. 29, Ch. 10) appears on first impression to mean that the law which requires the rejection of a ballot for senators and a ballot for representatives "if more names are voted for on a ballot than there are offices to be filled" applies to ballots for county officers and requires the rejection of the entire ballot for all such officers

whenever too many names for any one office are voted for and not merely the rejection of that portion of the ballot which includes the candidates for that one office. This was the impression that we had in the *Fernandez* case and we so ruled, although I believe the matter was submitted without argument. But since the argument has been made in this case I am convinced by examination of the various provisions of the two statutes. that the provision of the law which relates to ballots for senators. and representatives is inapplicable to ballots containing the names of all the candidates for county offices. The county act, Ch. 10, entitled "Elections," provides (Sec. 30) that the precincts and polling places established by law for the election of senators and representatives shall be the same for the election of county officers; (Sec. 31) that voters registered for senators and representatives shall be qualified to vote for county officers in the county where they reside; (Sec. 32) and may register before the boards of registration provided by law for the election of senators and representatives; (Sec. 33) that nominations for county officers shall be deposited with the county clerk with a deposit of $25 for expenses of election; (Sec. 34) that returns of election of county officers with the ballots, lists and records concerning the election shall be transmitted to the county clerk and preserved by him according to law; (Sec. 35) that upon failure of election of any county officer by reason of a tie vote a special election shall be ordered by the board of supervisors; (Sec. 36) that the board of supervisors shall issue a proclamation at least sixty days before a general election and forty days. before a special election; (Sec. 37) that ballot boxes for election of county officers shall be furnished by the board of supervisors, marked "County Officers"; (Sec. 38) that the county clerk shall prepare the ballots for county officers which "shall be of green paper and their general form, arrangement, number and style of printing shall be as prescribed by law for ballots for senators and representatives;" (Sec. 39) that the county clerk shall tabulate the returns of election and ascertain the result in the presence of any candidate or his agent who desires. to be present.

Comparison of this chapter of the county act with Ch. 7,
R. L., relating to general elections, shows that many provisions
in the general election law are clearly applicable to county elec-
tions, as, for instance, the requirements in Secs. 26 and 27
concerning the statement to be contained in the proclamation,
the languages and the newspapers in which it shall be pub-
lished and the places where it shall be posted; the provisions for
the appointment, tenure, meetings and powers of the boards of
registration, the applications for examination for registration
and the procedure in the examination of the applicant and other
matters relating to the registration (Secs. 37-58, Ib.); the num-
ber and appointment of the inspectors of election and their
duties (Secs. 59-63, Ib.); the hours for voting, admission within
the polling place and numerous other provisions relating to the
conduct of the election which are made applicable to county elec-
tions under the provision above quoted in Sec. 29 of Ch. 10.
Secs. 71 and 72, Ib., requiring separate ballots containing the
names of candidates for senators and representatives, are
obviously inapplicable to county elections. Indeed, the county
act does not specifically require one ballot for all the county
offices and it is only by inference from the requirement that the
ballots shall all be of the same colored paper and from the incon-
venience of a separate ballot and ballot box for each class of
county offices that the candidates for all the county offices may
be regarded as properly placed on one ballot. This fact is
significant since a mistake in voting for too many names on a
senatorial ticket or on a representative ticket would merely
invalidate the vote for the office of senator or representative, for
the obvious reason that it would be impossible to say for whom
the voter intended to vote, while in the case of a ballot contain-
ing the names of all the county officers a mistake in voting for
too many of any of the seven classes of offices would not for
the same reason invalidate the votes for the other offices on
that ticket.

The maxim applies *cessante ratione legis cessat ipsa lex,*
when the reason of any particular law ceases so does the law

itself. Co. Litt. 70 c. Whether the general law of elections is applicable to the county elections or not is a question of infer-ence or construction and the rule applies that a statute ought to be construed liberally in favor of the voter rather than against him. There is probably no other instance of the establishment of a territorial or state·government having general election laws followed, as in this case, many years after by a law estab-lishing county elections. Certainly no decision has been made known to this court under a statute which, like our county act, enacts so much only of the general election law as is applicable leaving the question of how much is applicable, as well as how much is inapplicable, to be determined by construction.

In the North Carolina case, 86 N. C. 358, the·statute was explicit, requiring that "if any ticket shall contain the names of more persons than said elector has a right to vote for or shall have a device upon it such ticket shall not be numbered in taking the ballots." The court necessarily held that it had no right to restrict the statute by the qualifying words "for the same office," also holding that the insertion of inadmissible names upon the ballot was in the nature of a "device put upon it for the purpose of distinguishing it."

The definition of a ballot under our general election law is "a written or printed or partly written and partly printed paper containing the names of persons to be voted for and the *office* to be filled." Sec. 68, R. L. A ballot for the county offices of supervisors, sheriff, county clerk, auditor, assessor and tax collector, county attorney and treasurer is·a ballot for seven dif-ferent offices and might properly be regarded as a ticket contain-ing seven ballots for the different classes of offices. In this view the ballot to be rejected would be that only which included the names of candidates for any one of these several offices. The general law distinguishes between ballots which were invalid because more names are voted for than there are offices to be filled and ballots containing any mark or symbol of identifica-tion or contrary to the provisions of the law. The two things are not identical, nor does it seem to me that voting for too

many names can properly be regarded as a mark or symbol of identification or as contrary to other provisions of the statute although unauthorized thereby.

The law requiring senatorial and representative ballots to be rejected if more names are voted for on them than there are offices to be filled is inapplicable to county ballots which place on one ticket the names of candidates for a series of different offices unless such tickets (for that is what they are) be regarded as containing a series of ballots, any one of which is to be rejected if it contains too many names voted for in any one of the series.

To sum up the foregoing: It is contrary to law to vote for too many persons for an office and such votes must be rejected as illegal whether their rejection is required by statute or not. The statute which makes void and requires the rejection of a senatorial ballot in which too many senators are voted for or a representative ballot for more representatives than can be elected is literally inapplicable to an entire ballot for all the county officers in which too many persons for any one of those offices are voted for and such ballots could not have been intended by and be contrary to the law relating to election of senators and representatives for no counties were then in existence. The county act, which prescribes the number of persons who may be elected for any one office, makes a vote for more than such number for that office illegal but does not make illegal the votes on the same ballot for the proper number of persons for the other offices. Voting for too many persons for any one county office is not the identifying mark or symbol intended by the general election law.

There is no reason why the statute which requires rejection of marked senatorial or representative ballots should not equally apply but there is every reason for applying it to county ballots in order to accomplish the object of the statute which is the same in one class of ballots as in the other. On the other hand there is no reason for applying, and there is abundant reason for not applying, to county ballots the statute which requires

rejection of a senatorial or representative ballot for too many persons in order to accomplish its .object of ascertaining for whom the vote is cast. The statute, for the purpose for which it was made, is applicable to county ballots to the extent only of the incorrect vote.

### DISSENTING OPINION OF WILDER, J.

I am compelled to dissent from that part of the majority opinion which holds that ballots with more names voted for than offices to be filled should be counted.

Section 29 of the county act provides that the "general laws and rules governing the election of senators and representatives of the Territory shall apply in the election of county officers wherever applicable except as herein provided."

Section 94 of the Revised Laws is as follows: "If more names are voted for on a ballot than there are offices to be filled; or, * * * if a ballot contains any mark or symbol whereby it may be identified, or any mark contrary to the provisions hereof; or, if two or more ballots are found in the ballot box so folded together as to make it clearly evident that more than one ballot was put in by one person; or, if a ballot in any other way be contrary to the provisions hereof; then such ballot and all it contains must be rejected. But no ballot shall be rejected for containing a less number of names voted for than the law authorizes. Each ballot which shall be held to be invalid as aforesaid shall be indorsed on the back by the chairman of inspectors, with his name or initials, and the word 'rejected.' "

The majority opinion holds that subdivision 1 of Section 94, R. L., is not applicable to county elections, the line of reasoning of the Chief Justice by which that conclusion is reached not being exactly followed by Mr. Justice Hartwell.

All that this first subdivision means is that, if there are more names on a ballot than the law authorizes, it must be rejected. That is clearly shown by a later provision in section 94, R. L., that a ballot shall not be rejected for containing a less number of names voted for than the law authorizes.

The first question to determine is whether the paper containing a list of the candidates for the various county offices constitutes one ballot or eight ballots. If it is only one ballot then there is no reason why the first subdivision of section 94 R. L. is inapplicable to county elections; otherwise if it is eight ballots. Sections 68 and 69 of the Revised Laws provide that "A ballot is a written or printed, or partly written and partly printed paper containing the names of persons to be voted for and the office to be filled. A ballot shall contain the name or names of the person or persons to be voted for; the office or offices for, and the district in which the election is being held; and the term or terms of the respective offices being voted for." That only one ballot is contemplated by the county act is clear to my mind. This is shown by the various provisions of that act in regard to the color of the paper, the uniform size, arrangement, number and style of printing of the ballots and that but one ballot box is provided for in each precinct in which all the county ballots are deposited. County Act, Secs. 37, 38, 54.

It is conceded by the majority that a ballot marked for too many names should not be counted so far as that particular part of it is concerned. Yet, by the express provisions of the statute, a ballot must be rejected as a whole or not at all. There is absolutely nothing in the statute giving the inspectors the right or authority to reject a ballot in part and count the balance. The only provision for rejecting ballots at all is found in this section 94 R. L., which is that *"such ballot and all it contains"* must be rejected. That section further provides how rejected ballots shall be marked, namely, by being indorsed on the back by the chairman of the inspectors with his name or initials and the word "rejected." But the majority of the court would add to the statute a provision for rejecting a part of a ballot and marking it accordingly.

In my opinion subdivision 1 of section 94 R. L. applies to county elections.

But, irrespective of that first subdivision, these ballots must be rejected because they clearly come within the other subdi-

visions of that section, namely, they are ballots contrary to and unauthorized by law. The proposition that a ballot with too many names voted for on it is unauthorized by law is so clear that it requires no discussion. And where is the authority to count a ballot in part when that ballot is unauthorized by law?

The holding by the majority that a ballot with more names voted for as to a particular office thereon than the law authorizes should be counted as to all other offices on the ground of an honest mistake of the voter is inconsistent with an holding that a ballot with a cross opposite the blank space provided for as to each office should not be counted at all, because there is the same honest mistake of the voter. In each case the ballot is not authorized by law.

Finally, a rule which was followed at the first election under the county act, which course was approved by this court in *Fernandez v. Adams* (unreported because petitioner discontinued after the ruling was made,) and which was again followed at the second election under the county act, should not be reversed unless the former ruling was clearly erroneous, which is not the case. The result is that whichever course is adopted by the inspectors at future elections is liable to be again reversed by this court.