Kulike v. Fern, 19 Haw. 278.

JAMES KULIKE, LYONS K. NAONE, DAVID KALEI, CHARLES HOLOUA, THOMAS KEOLANUI, JAS. WILLIAM LLOYD, EDWARD L. KAUAI, BOB P. KAAIHUE, JOSEPH KALANA, WM. PAOAKALANI, ROBERT HOBRON, JR., CHARLES KANEKOA, GEO. KAOLOPA, C. ARTHUR MACKINTOSH, WM. KAHELUEKAHI, JOHN KAAUA, H. M. VON HOLT, A. ST. C. PIIANAIA, SAMUEL MALOI, JOHN H. DE FRIES, R. W. AYLETT, C. B. MAILE, B. P. ZABLAN, GEORGE C. BECKLEY, JOHN J. COOK, CHAS. OPUNUI, WM. H. KEAWE, ROBERT H. HOBRON, WM. HENRY, GEO. E. BRUNS, DANIEL KEKAHA, WM. H. KNOX, JOHN A. HUGHES, LELAND S. CONNESS, F. W. MACFARLANE AND PAUL W. BURNS *v.* JOSEPH J. FERN.

ORIGINAL.

HEARD DECEMBER 11, 12, 21, 22, 28 AND 29, 1908.

DECISION FILED JANUARY 7, 1909.

HARTWELL, C. J., WILDER, J., AND CIRCUIT JUDGE DE BOLT IN PLACE OF BALLOU, J.

ELECTIONS—*petition for contest—immaterial allegations.*

Averments in a petition to contest an election, that in one precinct a certain number of persons voted after five o'clock when the polls should have been closed and that in another precinct a tally clerk was unlawfully allowed to remain in the polling place and by conversing in Chinese he attempted to and did influence Chinese voters, are immaterial unless further shown that these matters invalidated or changed the result of the election.

ELECTIONS—*contest by voters.*

An election cannot be contested by thirty voters unless they all have direct knowledge or information of one or more irregularities which would invalidate or change the result of the election.

ELECTIONS—*districts.*

Under the Municipal Act of 1907 there is but one election district in which the mayor is elected.

Kulike v. Fern, 19 Haw. 278.

OPINION OF THE COURT BY HARTWELL, C. J.
(Circuit Judge De Bolt Dissenting.)

This is a petition by James Kulike and thirty-five others, filed December 2, alleging that they are "duly qualified voters of the election districts of the County of Oahu," signed and sworn to by all of them, their jurat setting forth that "the facts, statements and allegations in the petition were just and true to the best of their knowledge and belief except such matters therein set forth and alleged to be upon information and belief, and as to these matters, things, allegations and statements they verily believe them to be true," the petitioners praying that upon legal proof being adduced on the "facts, statements and allegations in the petition the court adjudge and decree that John C. Lane was duly and legally elected Mayor," and further that the court require all the ballots cast at the election to be produced before it and that they be inspected and counted in support of the allegations in the petition and that such other order and relief be given the petitioners as is in accordance with law and that the respondent Fern be cited to appear and answer, the allegations being upon the petitioners' information and belief.

The petition itself alleges in substance, beside certain formal averments, that all the votes legally cast for Lane were not counted and that there were forty-six not counted; that in the eleventh precinct of the fifth district more than one-hundred-fifty-seven votes were counted for Fern which were not legally cast for him and that if all the votes legally cast for Lane had been counted for him and only the legal votes for Fern counted Lane would have received a majority of one-hundred-twenty-five and been duly elected; that in the third precinct of the fifth district the inspectors counted only forty-three votes for Lane and failed to count four votes legally cast for him; that in the second precinct of the fifth district the inspectors counted only eight votes for Lane and failed to count eight which were cast for

him; that in the ninth precinct of the fifth district the inspectors failed to count five votes for Lane counting for him in all seventy votes instead of seventy-five; that in the fourteenth precinct of the fifth district the inspectors counted only seventy-seven votes for Lane instead of one-hundred-four which were cast for him, and that one Crawford, acting as clerk and keeping a tally sheet, did not keep a correct count of the votes cast for Lane, which were one-hundred-four and not seventy-seven as shown by the tally sheet kept by Crawford and returned by the inspectors; that Crawford, in violation of Sec. 87, Ch. 7, R. L., remained in the space set apart for the polling place and influenced Chinese voters favoring Achi's election—offered to bet that Achi would receive a majority of the votes from there; that in the eighth precinct of the fourth district the inspectors counted only one-hundred-ten votes for Lane instead of one-hundred-twelve which were cast for him; that in the eleventh precinct of the fifth district the inspectors allowed twenty persons to vote after five o'clock p. m. when the polls should have been closed so that the votes so cast were illegally cast, making all the votes cast in that precinct, being one-hundred-fifty-seven for Fern, seventy for Lane and one-hundred for Achi, illegally cast; that Lane received twenty-one-hundred-eighty-eight votes and not twenty-two-hundred-twelve as tabulated by the clerk of the county and that Lane was duly elected by a majority of one-hundred-twenty-five over Fern.

The defendant's demurrer to the petition, based upon four grounds, the principal one of which was that it did not appear from the petition that the petitioners in any election district or districts had joined in bringing the proceeding, was overruled. Justice Wilder thought that the election districts intended by the statute were those designated in Sec. 2 of the Municipal Act, but acquiesced in the overruling of the demurrer. The Chief Justice and Judge De Bolt thought that the district intended was the one designated in Sec. 1, including the "Island

of Oahu and all other islands in the Territory of Hawaii not included in any other county and the waters adjacent thereto." Thereupon the defendant filed his answer including therein the averment that the petitioners were not duly qualified voters of any election district within the meaning of Sec. 57 of the act.

At the time set for hearing the petitioners appeared voluntarily at the suggestion of the court as in *Brown v. Iaukea*, 18 Haw. 131, *Cornwell v. Kaiue*, 18 Haw. 167, and *Blake v. Baker*, 19 Haw. 264, or in obedience to subpoenas taken out by their attorneys and were examined by the court as well as their attorneys in respect of their qualifications as voters, the districts in which they voted and their knowledge or information concerning the averments made in the petition. From this examination it appeared that thirty of the petitioners had not direct knowledge or information concerning any one or more irregularities which would invalidate or change the result of the election. Most of the petitioners had acquired their information from each other or from persons having no knowledge of the irregularities relied upon. The court then called for argument on the materiality of the averments in the petition relating to the presence of Crawford in one of the polling booths, his talking in Chinese to Chinese voters, and the keeping open of the polls after five o'clock, finally ruling that the averments were immaterial to the case.

After argument upon the subject the petition was dismissed on the morning of December 22 on the ground that it appeared from the testimony of the petitioners, and was admitted by them, that they had no direct knowledge or information concerning any irregularity which would defeat or change the result of the election, the court filing the following opinion, Judge De Bolt dissenting:

"HARTWELL, C. J.    The opinion of the court is that the petition must be dismissed upon the ground, amongst other things referred to in the rulings upon the questions argued yesterday, that it appears from the testimony of the petitioners that there are not thirty of them having knowledge or information with

reference to alleged irregularities in any one voting precinct. The opinion upon this matter, as well as upon the others ruled upon this morning, will be prepared and filed. I will now state a few considerations which have led the majority of the court to this conclusion.

To begin with the Australian ballot system in force here, which has been adopted in the states gradually during the last twenty years, has undoubtedly accomplished what it was intended to do in removing a great many of the opportunities previously existing for the exercise of coercion, intimidation and cheating at the polls, and it is a significant fact that in the contested election cases before the court I believe I am correct in saying there has been no instance showing actual fraud as contradistinguished from the legal fraud resulting from violations of the regulations of the voting law, the opportunities still remaining, and as long as human nature continues they will remain—as long as it continues as it is—of mistakes—honest mistakes—made on the part of the officials—of the inspectors—whether they be in counting wrongly or in improperly or erroneously rejecting or accepting ballots for the one side or the other. And it is also true that in no community is the result, especially in a close contest, going to be accepted with satisfaction by the losing party. How can they do so knowing the fallibility of human nature—the liability to mistakes of perfectly upright and honest men? Consequently you will find, I believe, in the states and the other territories generally that there are statutes, which we have not, which authorize and require a recount and a reexamination of the ballots either upon the request or petition of the defeated party or of a stated number of the electors. The tribunal which entertains those petitions verifies the official results as a matter of simple counting for one thing; they hear any objections made at the time of the reexamination of the ballots as to the validity of special ballots—individual ballots—and pass upon those objections. Exceptions may be taken by either side to the ruling of that tribunal on matters of law which are taken up like ordinary bills of exceptions in actions at law to an appellate court which passes upon them. I feel so strongly upon the natural and proper wishes of any community for such a tribunal that it is my intention to recommend an enactment

on the subject to the legislature, but as the law now stands the legislature has seen fit to intrust to this court the serious responsibility of deciding whether a contest is presented—causes of contest—or not, and if so, the duty of reexamining the ballots. That function was formerly performed with reference to elective representatives by the legislature of Hawaii. Why the legislature transferred that duty to the supreme court I cannot say. It may be—I should like to feel that it was—because it thought that this court would be of a non-partisan nature and that it might safely enough rely upon its integrity. But however that may be, there is the responsibility and we have to meet it. We have no time to examine statutes elsewhere to see what are their requirements of petitions. Under this title "Elec-tions," and subtitle "Contests," our statute gives either the losing candidate or thirty of the qualified voters in any election district the right to file a petition in the supreme court of the Territory setting forth any cause or causes why the decision of any board of inspectors should be reversed, corrected or changed.

"Now what is a contest? It is not an imaginary affair—not that certain voters think there probably were errors—and it is almost sure that there were and always will be errors. Is a contest based on mere belief or upon information more or less definite? That is to say, is it to be a guessing contest? We have all agreed that it cannot be, that there must be something definite before this court will consider that a cause making a contest is before it upon which reexamining the ballots either of one precinct or of all is justified, and it is seen that ordinarily recounting the entire vote results from examining the votes of one precinct, since a result in favor of the contestant requires the other party to insist upon our going through with the other precincts to see how they would bring him out.

"Now we have come to the conclusion—a majority of us—that the information which would justify us in regarding a contest as presented by thirty qualified voters requires that they shall know or have information, not secondhand, but direct information from those who have personal knowledge of irregularities in at least some one precinct requiring the bags containing the ballots in that precinct to be examined, otherwise any voter having information about irregularities in various precincts can state to twenty-nine others that he has heard so or can state to

four or five voters that he has heard of irregularities in another precinct, and so on, and the thirty be made up in that way. We think that the statute does not contemplate this. There is something more than responsibility or good faith in signing the petition which is required to present a contest. I take it that any one of the voters in this county would properly have felt justified, upon hearing from any other voter of the things alleged concerning the fourteenth precinct and being advised by counsel that those irregularities would be sufficient to invalidate the entire election, in joining with the twenty-nine others in signing the petition, being, unconsciously perhaps, influenced by the feeling that a recount is almost a matter of course, to ascertain the correct result of the vote and that it ought in common fairness to be made.

"The petition will have to be dismissed.

"WILDER, J.   I haven't anything to add except this, that I agree with the conclusion that the petition will have to be dismissed and will put my views in writing and file them later.

"JUDGE DE BOLT.   I find that I am obliged to dissent.   It seems to me that the statute clearly does not contemplate, as set forth in the reasoning announced by the chief justice, that thirty persons cognizant of the one fact are necessary to sign the petition.   As I view it, a duly qualified voter might stand by and observe in vain some act by which the rights of the citizens would be grossly violated and which would clearly nullify an election but still be helpless.   If the reasons given for the opinion of the court as announced are sound, no matter what rights of the citizen might be thus violated, as contemplated by the election laws, he could not act because twenty-nine others could not be had to join with him upon information and belief. Clearly, the legislature never contemplated that such a thing should exist.

"HARTWELL, C. J.   I will add this suggestion, that there might be such grave violations of law, known only to one voter present, which would justify him or any other voter receiving the information from him, in bringing a writ of quo warranto. The courts are not agreed whether the statutory remedies are exclusive or not."

Upon the evening of December 24 an attorney for the petitioners orally requested the court to hear argument upon the

question whether the statute required that in order that thirty qualified voters sustain a contest they must have knowledge or direct information of any one irregularity which, if shown by the evidence, would invalidate the election. The request was granted and counsel, although unnecessarily, filed a motion for rehearing in which they submit a point not heretofore presented, namely, that the court had no authority to examine the petitioners as to their knowledge or information of the matters charged in their petition. Strictly the motion could be struck from the files but this was not done and counsel were heard on the new matter as well on December 28. December 29 the following opinion was filed by the court:

"According to the practice in former election contests the defeated candidate could not obtain reexamination of ballots unless upon a showing, which was made in each case, that he had knowledge or direct information of some fraud, accident or mistake which would invalidate or change the result of the election. It must be a real and not an assumed or hypothetical fraud, accident or mistake to make an issue on which a controversy between candidates can arise. There is no contest or issue of fact or law presented by a statement that a decision of inspectors ought to be reversed, corrected or changed because petitioners believe, without definite information, that the decision was incorrect. The petitioners insist that it is unnecessary that the petition be verified at all and that the court, after answer filed, had no jurisdiction, before hearing evidence, to require the petitioners to prove any of their allegations. This has not been required further than to ascertain from the petitioners whether they all had knowledge or direct information concerning their charges, the object being to avoid reexamining ballots upon mere surmise of petitioners or others that there were irregularities. One of the attorneys of the petitioners is consistent in claiming that the law does not require of any petitioner any knowledge or direct information as to any irregularities charged. In this view any qualified voter, if he can get twenty-nine others to join him in a petition setting forth that any one believes that there has been error of the inspectors, can require the ballots examined and passed upon as well as counted.

Kulike v. Fern, 19 Haw. 278.

"The statute (Sec. 56) requires that 'All questions as to the validity of any ballot cast at any election held under this Act shall be decided immediately and the opinion of the majority of the Board of Inspectors of Election at each polling precinct shall be final and binding, subject to revision by the Supreme Court of the Territory as hereinafter provided;' and further (Sec. 57) that 'Any candidate directly interested' (it will be observed that a candidate indirectly interested has not this right) 'or any thirty duly qualified voters of any Election District may file a petition in the Supreme Court setting forth any cause or causes why the decision of any Board of Inspectors should be reversed, corrected or changed,' referring, of course, to decisions as to the validity of any ballots.

"The two ways of looking at the subject then are (1) that any thirty voters may dispute the decision of the inspectors in their own district, meaning, as held, the entire Island of Oahu, whether any of them know or have heard of any fatal irregularities or not; (2) that all must have such knowledge or information. In the former view it was suggested by the petitioners at their first argument that their case is like that of a creditors' bill in which one or more creditors represent all others. In the latter view all of the thirty voters and not merely one or any less number than thirty must combine to present a cause in order to make a contest. In the former case the only responsibility in bringing the petition is that thirty voters desire a reversal of the inspectors' decision which they believe to be erroneous. In the latter case, in order to obtain reconsideration of election results, emphasis is placed upon the necessity of a contest or a cause of action by each of the thirty voters in respect to some one or more decisions, which controversy could not exist unless each of them had at least heard of an alleged wrong decision.

"The petitioners' attorneys say that those whom they represent do not understand why the court allows a contest to be made and ballots reexamined on the petition of one person, he being a defeated candidate, and not on the petition of thirty voters. This is a misunderstanding of the causes, for the court places the petitioners on the same basis applying the same rule to each in requiring some fatal fact within the knowledge or

Kulike v. Fern, 19 Haw. 278.

information of the petitioner, when he is a defeated candidate, or of the thirty petitioners when they bring a petition.

"It is urged by the petitioners that the court has no authority to raise the question as to their knowledge or information, the question not being raised in the answer. The answer, however, neither admits nor denies the petitioners' averment of their knowledge or information but leaves them to its proof. In a controversy of a public nature the court would not perform its duty to the public if it did not require the status of the petitioners not only as qualified voters but as having information and belief of their charges to be shown before having the ballot bags opened.

"In the American cases cited by the petitioners it is clearly stated that the object of the notice of a contest of an election is not to perform the function of a declaration at law but to apprise the opposite party that a contest will be made on the grounds mentioned. Our statute on the contrary requires a contest to be presented by the petition. Even in statutes like that of Massachusetts permitting any ten voters to obtain a recount of ballots upon 'the filing of the proper statement in writing by ten or more qualified voters of the ward that they have reason to believe that the returns of the ward are erroneous' (Opinion of the Justices, 136 Mass. 586), a statement by ten or more voters that others than themselves, or that any less number than ten had reason to believe this, would not comply with the statute.

In *Lawrence v. Norreys*, 39 L. R. Ch. D. 213, also cited upon the claim of the petitioners that it would be unauthorized practice for a court of equity to question the truth of the averment in their petition of their information and belief instead of leaving them to put in their entire case, Stirling, J., said upon this subject: 'Now, as to that, it is undoubtedly true that as a rule a plaintiff is allowed in this Court to state his case in the first instance without in any way verifying it by oath; and the Court ought to be slow, as I conceive, when a plaintiff *bona fide* brings forward a case, in shutting him out from stating it, and from trying it in the manner provided by law.' (p. 225.) Upon appeal, however, this ruling was reversed, the appellate court saying (Cotton, L. J.): 'But the jurisdiction of the Court to prevent its process being abused, and to prevent actions being brought which are mere vexation, is original and does not depend

on the general orders of the Court. * * * * The Plaintiff has not, in my opinion, shewn that he has any reasonable ground for making those allegations of fraud, and the conclusion which I draw is, that they were made without any reasonable ground for making them.' (p. 231.)

"The inquiry made by the court in this case was justified by precedent as well as upon principle.

"A majority of the court find no ground for reversing the former ruling which is accordingly affirmed."

After service and the filing of a demurrer by the defendant the petitioners filed fifteen affidavits from alleged voters in one precinct, setting out for whom they voted, together with a joinder in demurrer and a motion to set the demurrer for hearing, the defendant then filing a motion to strike the affidavits from the files. All of these papers the court of its own motion ordered to be withdrawn.

The court unanimously ruled that the averments were immaterial which related to the inspectors in one precinct allowing twenty persons to vote after five o'clock in the afternoon of the election day when the polls should have been closed, and in another precinct in allowing Crawford within the space set apart for the polling place and that by conversing in the Chinese language he attempted to influence and did influence by words and acts Chinese voters.

It does not appear that Crawford was within the balloting compartment referred to in Sec. 87 R. L. in which a voter is required to be alone for the purpose of marking his ballot. There is not enough alleged in regard to this matter or in the alleged attempt of Crawford to influence Chinese voters to indicate a change in the result, or in invalidation of, the election.

The allegation in regard to twenty persons voting after five o'clock was also insufficient in the absence of allegation of circumstances rendering it probable, prima facie, that sufficient of the alleged illegal votes were cast for Fern to invalidate or change the result of the election. *Lehlbach v. Haynes*, 54 N.

J. L. 77; *Ex parte Murphy*, 7 Cow. 153. For all that appears on the face of the petition, Lane may have benefited by keeping the polls open a little after the closing time.

Petition dismissed.

*G. A. Davis, A. G. M. Robertson, A. L. C. Atkinson* and *A. F. Judd* for petitioners.

*E. M. Watson* and *W. W. Thayer* for respondent.

### CONCURRING OPINION OF WILDER, J.

Section 57 of the Municipal Act provides that "Any candidate directly interested, or any thirty duly qualified voters of any election district may file a petition in the supreme court of the Territory setting forth any cause or causes why the decision of any board of inspectors should be reversed, corrected or changed." The petition in this case is brought by some thirty-six persons who are alleged to be duly qualified voters of the election districts of the city and county of Honolulu, and who voted at the election for mayor held on November 3, 1908, in that city and county. The principal objection raised by the demurrer is that the petition does not show that it is brought by thirty duly qualified voters of any election district, the defendant contending that the election districts prescribed by R. L. Sec. 105, (which are the 4th and 5th,) are the ones referred to in the Municipal Act. The petitioners claim that the Municipal Act in providing for the election of a mayor by all the qualified voters of the city and county specifies but one election district, although, as already pointed out, the petition is not drawn on that theory.

The thirty voters who desire to contest an election must all come from one election district. That is clear I think.

If R. L. Sec. 105 applies, it is by virtue of Sec. 40 of the Municipal Act which provides that "The general laws and rules governing the election of senators and representatives of the Territory shall apply in the election of city and county officers

wherever applicable except as herein provided." It may be fairly contended, I think, that the election districts prescribed by general law would apply in the election of city and county officers were there no other provision in the Municipal Act on the subject. Section 2 of the Municipal Act, however, provides that the city and county of Honolulu "is hereby divided into six districts," naming them. In each one of these districts an election is held for city and county officers, for most of whom electors of a particular district vote in conjunction with the electors of the other districts, the sole exception being the deputy sheriffs who are elected solely by the electors of a particular district. An election district is one within the prescribed limits of which an election is held. The Municipal Act, then, having divided the city and county into districts and provided for elections in each of those districts, it follows that, when it allows thirty voters of an election district to contest an election, the election district referred to is a district which the act itself provides and in which it also provides for an election. This view is strengthened when the County Act, from which the identical language in question is taken, is considered. That act divided the County of Oahu into the same six districts as the Municipal Act, all of the supervisors, except one who was elected at large, then being elected from different districts. Under that act it could not be said that there were four election districts for all of the supervisors but one, six election districts for deputy sheriffs and but one election district for the remaining officers. The same language having been used in the later act as in the earlier one, it is nothing but natural that the same meaning was intended.

Furthermore, by section 76 of the Municipal Act, a certain number of legal voters may institute proceedings for the removal of officers, and the expression there is not voters of any one election district but voters "within the city and county," which tends to show that the geographical limits of election districts men-

tioned in the act and of the city and county are not the same, otherwise the same words would have been used in both places. A similar distinction is contained in sections 41 and 60 of the County Act.

The contention of the petitioners, which was upheld by the majority of the court, that the district intended was the one designated by section one of the act, is also open to criticism because that section does not specify any district at all.

The argument of petitioners that if there are six election districts thirty voters of one district may contest an election in another district is not sound. What the thirty voters of one district may do is to contest an election for a particular office in that district in which they are qualified to vote, even if the electors of other districts also are entitled to vote for the same office.

The petition in this case not setting out that thirty of the petitioners are duly qualified voters of any particular election district, the demurrer should be sustained. But as it appeared from the preliminary examination of the petitioners that at least thirty of them were qualified voters of one election district, namely, Honolulu, and as, therefore, enough of the petitioners have in fact the qualifications required by statute, the petition is amendable in that regard, (15 Cyc. 412), and I consequently concur in the overruling of the demurrer. I also concur in the various other rulings set forth in the opinion of the Chief Justice.

---

## DISSENTING OPINION OF CIRCUIT JUDGE DE BOLT.

I respectfully dissent from the opinion and judgment of the court in dismissing the petition, particularly as regards the circumstances under which it was dismissed. I concur, however, in the opinion of Mr. Chief Justice Hartwell in overruling the demurrer.

With regard to the petition, it will be observed that the jurisdictional requirements prescribed by the statute, (Act 118, Ch. XI, Laws 1907), relative to election contests, are:

1.   That the petition be filed by thirty duly qualified voters of any election district.

2.   That it set forth a cause or causes why the decision of any Board of Inspectors should be reversed, corrected or changed.

3.   That it be filed within thirty days after the election.

4.   That it be accompanied by a deposit of $25.00 for costs of court.

The petitioners complied with all these requirements; and the petition having been held legally sufficient on demurrer, and the respondent having thereupon filed his answer, an issue of fact was thereby presented for judicial determination.

It must be conceded, for it follows necessarily, that counsel for the petitioners were justified in assuming that this issue of fact would be examined into and disposed of in the usual manner, that is to say, in accordance with the established rules of practice and procedure prevailing in courts of justice.

But instead of being permitted to thus proceed, the petitioners at this point in the case were called, sworn and examined by the Chief Justice as to the source and nature of their information upon which their petition was based.   Upon this examination being closed a majority of the court interposed a question somewhat like a special demurrer, namely, whether or not the facts disclosed by this examination were sufficient to sustain the petition.   Argument was had, after which the petition was dismissed, petitioners not being allowed to offer any evidence.

To my mind such a proceeding breathes the air of anomaly. It has no place in the due and regular administration of justice. It is a stranger to the law.

Kulike v. Fern, 19 Haw. 278.

It is elementary, and an essential part of the legal education of every lawyer, that in any legal controversy in any tribunal known to the law, that when the issues of law are disposed of and an issue of fact is presented, the trial or hearing upon this issue follows as a logical sequence, and shall be disposed of according to law and the established rules of judicial procedure. The party holding the affirmative of this issue has the absolute right to conduct the presentation of his cause, either in person or by counsel, under the supervision of the court, and to adduce his evidence in proof of the controverted fact. This right is inherent and no court can rightfully take it from him.

These are plain simple rules, but they are indispensable to the due and orderly administration of justice. And, accordingly as they and the principles upon which they rest are observed, or the contrary, determines the difference between a government by law and a government by men. The former promotes the good order, happiness and prosperity of a people, while the latter tends to foster tyranny, oppression and injustice.

It is inevitable, that whenever a court departs from the well defined channels of judicial procedure, or passes beyond the realms of the law, however worthy the purpose or motive may be for so doing, it at once enters upon the boundless domain of arbitrary power. Hence, the preliminary examination of the petitioners by the court after an issue of fact was joined and the summary dismissal of the petition, without permitting the petitioners to offer any evidence in support thereof, was, in my opinion, in conflict with those vital principles just alluded to, and was wholly unwarranted.

Such procedure, if had in civil actions *inter partes,* would result in the summary dismissal of many a meritorious cause in which the plaintiff, having no personal knowledge of the facts set forth in his petition or complaint, necessarily would be obliged to rely for his proof on the testimony of others, and sometimes even on the testimony of the adverse party.

It cannot be rightfully .assumed that the petitioners expected to maintain this contest on their information and belief, but upon the sworn testimony of their witnesses able to testify of their own knowledge as to the facts and matters set forth in their petition, in the same manner in which parties in any other cause prove their contentions.

Counsel for petitioners informed the court that their witnesses were in attendance and ready to be sworn and to testify, but the court refused to hear them, or allow the petition to be amended by adding other names thereto, (9 Mont. 497) and thereupon summarily dismissed the petition. To my mind this was repugnant to the inherent principles of right and justice.

If the facts as set forth in the petition were true, then it follows that the summary dismissal of the petition, was a grievous wrong, not only to the defeated candidate, but to the entire community.

With regard to the so called precedents cited in justification of the preliminary examination of the petitioners, I submit that, for the reasons already stated, they should not be followed, even though they may be in point. It does not appear, however, that the court in any of them went as far as in this case.

Precedents, if found to be contrary to reason and justice, should not be followed. "For", as Blackstone says: "if it be found that the former decision is manifestly absurd or unjust it is declared, not that such a sentence was bad law, but that it was not law; that is, that it is not the established custom of the realm, as has been erroneously determined."

Moreover, the doctrine of *stare decisis*, except when the decisions have settled a rule of property or involve contractual rights, is not strictly applied.

With regard to the holding of the court that each petitioner was obliged to have knowledge or direct information of the same irregularity, mistake or fraud, as set forth in the peti-

tion, and also that each be required to show under oath, on preliminary examination conducted by the court, not by counsel under the supervision of the court, that such knowledge and information was correct, before an examination of the ballots could be had, I find it beyond my comprehension to conceive upon what possible theory the court was able to so expand and enlarge the plain and explicit language of the statute in this regard.

As I view the matter the court required something of the petitioners which the statute clearly does not require of them. The court attempted to import into the statute provisions which it does not contain.

All that the statute requires is that the petition shall set forth a "cause or causes why the decision of any Board of Inspectors should be reversed, corrected or changed." It will thus be observed that the statute does not require that the petitioners shall have either knowledge or information of the grounds of the contest, much less to be obliged to submit themselves to a preliminary examination such as was required of them in this case.

The statute does not even require that the petition shall be verified by the oath of petitioners. And all that is required by way of showing that the contest is made *bona fide* is that the petition be filed by thirty qualified voters and at the same time deposit $25.00 as costs of court. The legislature deemed this sufficient and the court can require no more. One qualified voter could file the petition as well as any number of voters could, but evidently the legislature, in considering the interest the public has in an election contest, concluded that more than one was necessary or proper as a guarantee of good faith. Hence, the reason for requiring that the petition be filed by thirty duly qualified voters. And this being complied with the legislature has in effect said that it was the plain duty of the court to proceed with the hearing as in any other cause. A

petition thus filed and presented to the court gives the contestants a perfect right to offer their evidence, and it accordingly becomes the duty of the court to receive and to duly consider such evidence.

All that the court can properly require in addition to the plain terms of the statute, is that the petitioners adduce enough evidence to warrant an examination of the ballots. And the court in an election contest, as well as in any other case, can safely permit petitioners, through their counsel, to present their cause in their own way, under the supervision of the court as a matter of course.

The law recognizes the right as well as the propriety of parties being represented by counsel. Reputable counsel learned in the law and familiar with judicial procedure are indispensable in the due administration of justice. A court can better subserve public interests in an election contest by a willingness to hear what the parties have to say with regard to their claim than to turn them away unheard.

It has been held that in a statutory contest, where the contestant alleges error, mistake, fraud, misconduct, or corruption in counting the ballots or declaring the result of an election, a recount of the ballots should be ordered as a matter of course upon the request of the complaining party, because the ballots themselves, if properly preserved, are the highest and best evidence of the expression of the will of the voters. According to the weight of authority, however, a resort to the ballots themselves cannot be had until the contestant produces evidence making a *prima facie* case which indicates at least a probability that a recount would decide the election in his favor. (15 Cyc. 429). Counsel informed the court that they were ready to put on their evidence with the view of showing at least a *prima facie* case. Under all the authorities they were clearly entitled to do this. The court should have granted this request. The fact that the court had taken the testimony of the petitioners,

Kulike v. Fern, 19 Haw. 278.

if it can be called testimony, was no reason why it should refuse to hear proper testimony. The point being that the examination of petitioners by the court was wholly unauthorized by law.

In *Brown v. Iaukea*, 18 Haw. 131, it seems that the court proceeded to inspect the ballots upon nothing more than the mere allegations in the petition and without requiring any evidence at all. Subsequently the contestant took the stand and testified that he had some information of irregularities in two precincts, but as to the remaining allegations in his petition they were "a matter of guess-work." Upon this showing, however, the ballots of *all* the precincts were opened and examined.

It is proper that the court should guard against a mere fishing excursion, but this can be done with safety and propriety, by requiring, or by permitting, as was requested in this case, the contestants to adduce some evidence sufficient to show *prima facie* grounds for inspecting the ballots. And under the precedent of *Brown v. Iaukea* a slight showing only is required for this purpose.

With regard to the construction of statutes providing for the contesting of elections, the courts look upon such statutory provisions with favor. A strict compliance with the letter of the statute is unnecessary so long as the spirit of the enactment is complied with.

McCrary on Elections (431) says:

"It may be stated as a general rule, recognized by all the courts of this country, that statutes providing for contesting elections are to be liberally construed, to the end that the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections."

See also 15 Cyc. 412.

In *Whitney v. Blackburn*, 17 Org. 564, the court said:

"It is the duty of courts to disregard mere technical rules or defects, and to liberally construe the law that the rights of the

people may be preserved, and that no protection may be afforded to fraud."

In *Curry v. Baker,* 31 Ind. 155, the court said:

"It is never the duty of courts to place so rigid a construction upon the language of any act, where there is room for interpretation, as to defeat the purposes of the legislature. Still less are we disposed to adopt such a view where the object of the law is to secure to the electors the purity of the ballot-box, by subjecting to the scrutiny of the courts the conduct of the officers in charge of the election."

In *Minor v. Kidder,* 43 Cal. 236, the court said:

"It is the wholesome purpose of the statute to invite inquiry into the conduct of popular elections. Its aim is to secure that fair expression of the popular will in the selection of public officers, without which we can scarcely hope to maintain the integrity of the political system under which we live. With this view it has provided the means of contesting the claims of persons asserting themselves to have been chosen to office by the people. * * * * When such a statement is presented by an elector of the tribunal whose duty it is to investigate its merits, it should not be received in a spirit of captiousness, nor put aside upon mere technical objections designed to defeat the very search after truth which the statute intended to invite. The investigation proposed is one in which the public at large are deeply concerned."

In the opinion of the Justices to the Governor and Council of the Commonwealth of Massachusetts, (136 Mass. 583) respecting a statute which provided that an election might be contested by ten voters upon their written statement that they had reason to believe that the returns of the officers were erroneous, the court said:

"The provisions of the thirty-sixth section are clear and explicit, and seem to us to admit of but one construction. They authorize and require the boards of aldermen of cities to recount the ballots cast in any ward, upon the filing of the proper statement in writing, by ten or more qualified voters of the ward, that they have reason to believe that the returns of the ward officers are erroneous. * * * * The statute contemplates that

Kulike v. Fern, 19 Haw. 278.

the statement is to be made by plain people, and technical and narrow rules of construction ought not to be applied to it."

In *Richardson v. Farrar*, 15 S. E. 119, the court said:

"The statute is a broad and summary remedy for fraud in public elections, without formal pleadings, and provides a mode of contest without technicalities, and directing the county court to hear and determine the contest upon the merits and the proofs, according to the very truth and right of the matter in controversy."

In conclusion I deem it proper to observe that in this Territory the Supreme Court is given original and exclusive jurisdiction in election contests, and its decisions therein are final. Hence, the importance of a most liberal construction of the statute.

Contestants should have ample opportunity, consistent with law, to present their case and the evidence in support thereof, to the end that the will of the people in the choice of public officers may not be defeated.