HARRY H. ALLEN *v.* SAMUEL M. SPENCER.

No. 1670.

ORIGINAL.

ARGUED APRIL 5, 1926.                    DECIDED APRIL 27, 1926.

PERRY, C. J., LINDSAY AND BANKS, JJ.

ELECTIONS—*contests—pleading—petition.*

> The statute relating to county elections does not permit a recount as such. It provides merely for a contest, to sustain which the petitioner should allege of his own knowledge or on information and belief, and not as mere guesswork, facts sufficient to change the result of the election.

SAME—*allegations on information and belief—nature of information.*

> When in such a case the essential allegation of the petition is that certain named voters voted for the petitioner and not for the respondent and that allegation is based upon information claimed to have been given by the voters named to certain notaries who in turn informed the petitioner and the same voters in affidavits filed in the cause *in limine* either deny that they gave the information or assert that the information was untrue and that in fact they voted for the respondent, the petitioner does not present a showing of information sufficient to sustain a contest or to justify a recount.

OPINION OF THE COURT BY PERRY, C. J.
(Banks, J., dissenting.)

This is a petition filed under R. L. 1925, section 1629, relating to election contests. At the election held in the County of Hawaii on November 10, 1925, the petitioner and the respondent were the duly nominated candidates for the office of chairman and executive officer of the board of supervisors. The respondent was by the inspectors declared elected. The petitioner now asks that that decision be set aside and that he be declared elected. In the petition it is alleged that under the decision of the inspectors the petitioner received 3376 votes and the re-

spondent 3398 votes, or a majority for the respondent of 22 votes. The changes thus necessary to alter the result would be 12 votes. Continuing, it is alleged that the petitioner in fact received 3396 votes and the respondent 3378 votes, or a majority in favor of the petitioner of 18 votes. Necessary to change the result, 10 votes. Descending to particulars, the petitioner alleges that in precinct 4, while the inspectors reported for him 75 votes and for the respondent 141 votes, the petitioner in fact received 80 and the respondent 136; that in precinct 16, while the inspectors reported for him 44 votes and for the respondent 88, the petitioner in fact received 51 and the respondent 81; and that in precinct 12, while the inspectors reported for him 41 votes and for the respondent 45, the petitioner in fact received 49 votes and the respondent 37. In an effort, apparently, to meet the requirements of former decisions of this court on the subject of election contests the petitioner, making the above essential allegations on information and belief, makes a part of his petition certificates signed (but not sworn to) by three notaries public. In one of these certificates the notary, Ernest Vredenburg, says that 80 of the registered voters who voted in precinct 4 and whose names are stated in the certificate told him under oath that they had voted for the petitioner. In another certificate the notary, Charles H. Weatherbee, says that two voters, specifically named, who voted in precinct 12, told him under oath that they had voted for the petitioner. In a third certificate the notary, Thomas A. Aiu, says that 47 voters, specifically named, who voted in precinct 12, told him that they voted for the petitioner; and in a fourth certificate the last named notary says that 51 voters, specifically named, who voted in precinct 16, told him under oath that they voted for the petitioner. This in-

8

formation, if true, would show that the petitioner had been elected.

Upon the filing of the petition the respondent moved to dismiss the same and in support of his motion filed affidavits by some of the individual voters who voted at the election. Of these voters one says that he did sign the affidavit mentioned in the notary's certificate "rather than argue the point." Fifteen deny that they ever signed or swore to any statement to the effect claimed by the notaries; two say that they signed the statements in question but did not swear to the same; one says that she signed but did not know the contents of the paper; and one does not say whether she did or did not sign or swear to the statement. Of the affiants sixteen say under oath that they voted for the respondent and not for the petitioner, these being sixteen of the same persons named by the petitioner as persons who voted for him; and four others deny that they voted for the petitioner (without saying specifically that they voted for the respondent), these four likewise being of the persons named by the petitioner as persons who voted for him. In reply to these affidavits the petitioner filed an affidavit of his own in which he specifically admits that of the persons named in the certificates of the notaries as persons who had sworn that they voted for the petitioner the following seven did not in fact so state to the notaries: McKinley Kaupu, Mrs. Emmaline M. Magoon, Samerson K. Wright, Henrietta Lincoln, Mrs. Kamahana Kahunaaina, J. K. Paauhau and Mrs. Kalahikiola Paauhau. In the same affidavit the petitioner further specifically admits that Mary Keanu, one of the 51 persons named in one of Aiu's certificates as having voted for the petitioner in precinct 16, was not a voter in that precinct but was a voter in precinct 14, which latter is not one of the three precincts in which in this petition errors are alleged to

have occurred; and further admits that Charles K. Lindsay, one of the persons in the list of 80 named by Vredenburg as having made the statement to him under oath that he voted for the petitioner in precinct 4, was not sworn by Vredenburg on December 4, 1925 (the petition was dated December 5 and process was issued December 7, 1925), but was sworn on December 11, 1925.

To summarize the showing made by the petitioner and the counter-showing made by the respondent: The petitioner admits that of those who are named in his petition as having said under oath to the notaries that they voted for him, seven did not in fact say so (only four of these seven have made affidavits now on file) and one other did not vote in the precinct in question. In addition to these eight, fourteen others of the voters named in the notaries' certificates have sworn, in affidavits filed in this cause and prepared for that purpose, that they did not vote for the petitioner and at least three others have similarly sworn that they did not say to the notaries that they voted for the petitioner. Deducting this total of twenty-five from the total votes cast, as claimed by the petitioner, his majority of eighteen dwindles to a minority of seven; and no error is shown in the election results as declared by the inspectors. Summarizing again in somewhat more detail: The petitioner claimed in his petition that in precinct No. 4 eighty persons named voted for him. By admissions and counter-affidavits it now. appears that eight of those persons did not vote for him, leaving in his favor a total of seventy-two. The inspectors by their decision awarded him seventy-five. The petitioner claimed in his petition that in precinct 16 fifty-one persons named voted for him. By admissions and counter-affidavits it now appears that of these same persons eight did not vote for him, leaving in his favor but a total vote of forty-three. The inspectors by their decision awarded

him a total of forty-four. The petitioner claimed in his petition that in precinct 12 forty-nine persons named voted for him. By admissions and counter-affidavits it now appears that of these same persons nine did not vote for him, leaving in his favor a total vote of forty. The inspectors awarded him a total of forty-one. By this method of computation, also, it appears that no error is shown in the results of the election as declared.

In former election cases this court, construing the same statute under which the present proceeding was instituted, has held clearly and definitely that our statute does not provide for or permit a mere recount by this court of the votes cast at the election. In other words, it has been held that no defeated candidate or set of voters is entitled to a recount by merely asking for it. The rulings have been uniform that what the statute provides for is a contest; that in order to permit of an examination of the ballots themselves the petitioner in his petition must set forth cause why the decision of the board of inspectors should be reversed, corrected or changed; and that to sustain the petition "the petitioner should allege of his own knowledge or on information and belief and not as mere guess-work facts sufficient to change the result of the election." *Brown* v. *Iaukea,* 18 Haw. 131. In several former cases this court has *in limine* cross-examined the petitioner in order to ascertain whether the assertions of the petition were based on "mere guess-work" or on definite information sufficient for the purpose. See *Brown* v. *Iaukea, supra; Cornwell* v. *Kaiue,* 18 Haw. 167; *Blake* v. *Baker,* 19 Haw. 264, 266; and *Kulike* v. *Fern,* 19 Haw. 278, 281, 283, 285. In *Kulike* v. *Fern* Chief Justice Hartwell said: "According to the practice in former election contests the defeated candidate could not obtain reexamination of ballots unless upon a showing, which was made in each case,

that he had knowledge or direct information of some fraud, accident or mistake which would invalidate or change the result of the election. It must be a real and not an assumed or hypothetical fraud, accident or mistake to make an issue on which a controversy between candidates can arise. There is no contest or issue of fact or law presented by a statement that a decision of inspectors ought to be reversed, corrected or changed because petitioners believe, without definite information, that the decision was incorrect. The petitioners insist that it is unnecessary that the petition be verified at all, and that the court, after answer filed, had no jurisdiction, before hearing evidence, to require the petitioners to prove any of their allegations. This has not been required further than to ascertain from the petitioners whether they all had knowledge or direct information concerning their charges, the object being to avoid reexamining ballots upon mere surmise of petitioners or others that there were irregularities." The court further held "that the information which would justify us in regarding a contest as presented by thirty qualified voters" (in that case the petition was signed by more than thirty qualified voters) "requires that they shall know or have information, not secondhand, but direct information from those who have personal knowledge of irregularities in at least some one precinct requiring the bags containing the ballots in that precinct to be examined." In *Blake* v. *Baker, supra,* the court "required the petitioner to take the stand at the outset in order to show that he had definite knowledge or information in regard to the error alleged sufficient to show that this was not merely a fishing expedition or a proceeding for a recount as distinguished from a contest under the statute."

These principles are well established in this jurisdiction. They underlie and affect the present proceeding

even though the precise set of circumstances existing in the case at bar has not been encountered in any former case of this general nature. Any possible question as to whether the information given by the voters to the three notaries and by the latter repeated to the petitioner is "secondhand" and is therefore insufficient under the rule laid down in *Kulike* v. *Fern* at page 283, quoted above, may be passed over in favor of the petitioner. So, also, it may be assumed in the petitioner's behalf that the fact that the voter, Charles K. Lindsay, made his sworn statement to the notary, not on December 4, 1925, prior to the filing of the petition, but on December 11, 1925, after the filing of the petition, is immaterial,—on the theory that the defect, if any, could be cured by amendment to the petition. It may further be assumed that the "Mrs. Kaupena Puou" who makes the affidavit, filed in this court, that she did not vote for the petitioner is not the same person as the "Mrs. Senator Puou" who is named by the petitioner as one of the persons who voted for him. Upon the petitioner's admission that seven of the persons out of the forty-seven from precinct 12, named in Aiu's certificate, did not give the notary the information which the notary says they gave him and upon the further admission that Mary Keanu was not a voter in precinct 16, the case stands as though the petitioner had not received from these eight persons any information supporting a legal cause of contest. So, also, as to the seventeen other persons who have made affidavits, filed by the respondent in this case, to the effect that they did not vote for the petitioner (these being seventeen of the same persons claimed by the petitioner to have voted for him), the position of the petitioner is that, while he asserts that the three notaries told him that these seventeen told one or the other of the three that they had voted for the petitioner, the seventeen now assert in this court under oath,

one that he made the statement to the notary but simply to avoid importunity, two that they made the statements but not under oath and the rest that they did not make the statements claimed and all of them that they voted for the respondent and not for the petitioner. In our opinion the petition is not supported by direct, credible information sufficient to show that the inspectors made any error in their count of the votes. At the first opportunity the affiants (a sufficient number of them to affect the result) have either withdrawn the statements made to the notaries or have denied making them. In effect it is as though the recital of the petitioner's information was that at an earlier date these voters told him that they had voted for him and at a later date told him that they had voted for the respondent. If we were weighing these conflicting statements we would be inclined to the belief that any earlier statements, out of court, made to the petitioner's agents before institution of suit were made merely to avoid importunity or to court favor and that the later statements, in court, were made with a greater sense of responsibility and duty and are more to be relied upon; but if it can be said that the affidavits in court are not entitled to any greater credence than the earlier statements then it follows that the net result ought not to be in the mind of the petitioner, and is not in the mind of the court, a feeling of any greater certainty or dignity than a mere surmise as to what did happen. In either event, the court cannot upon such a showing find that any cause of contest has been set forth or undertake to enter upon an examination of the ballots. In order to secure a recount the petitioner should make a showing of cause which is consistent and reliable with respect to the information which is cited to support the claim of errors.

The petition is dismissed.

*Harry Irwin, D. E. Metzger* and *J. L. Coke* for petitioner.

*Robertson & Castle* for respondent.

### DISSENTING OPINION OF BANKS, J.

I respectfully dissent. In the opinion of the court it is stated: "Any possible question as to whether the information given by the voters to the three notaries and by the latter repeated to the petitioner is 'secondhand' and is therefore insufficient under the rule laid down in *Kulike* v. *Fern* at page 283, quoted above, may be passed over in favor of the petitioner." From this statement it may be assumed that the judgment dismissing the petition is based largely on the ground that the case made by the petitioner in his pleading has been entirely disproven by the *ex parte* affidavits of certain voters who declare that they did not vote for the petitioner but for the respondent. The effect of this is to finally decide the case on *ex parte* affidavits. This seems to me a radical departure from the ordinary and approved procedure by which judicial controversies are tried and the rights of litigants ultimately determined. Speaking on the subject of affidavits as evidence the supreme court of Pennsylvania in *Pittsburg's Appeal,* 79 Pa. at page 323, said: *"Ex parte* affidavits are at best but a very weak kind of evidence and generally form but the ground of some preliminary or interlocutory action but are never, unless it be especially so provided by Act of Assembly or rule of court, the foundation for final judgment or decree." In his petition Allen tendered an issue of fact. If the respondent had wished to deny this issue of fact he should have done so by answer. Upon issue being thus joined each party should have been given the right to offer such evidence as the court deemed competent. This course would certainly be followed in any other civil suit and there is no ap-

parent reason why it should not have been adhered to in the present case. In fact the record discloses a strong reason why the court should have heard this case in the customary way. Ten of the affiants, upon whose affidavits the court dismisses the petition, are among those who according to the certificates of the notaries had previously made oath that they voted for the petitioner and not for the respondent. The inquiry naturally arises, when were they telling the truth? Is it safe to deny the petitioner his day in court upon the assumption that these affiants told the truth in their last affidavits and a falsehood in their statements made under oath to the notaries? According to the petition if they told the truth in the oath they took before the notaries the election returns were erroneous and the petitioner was elected. Under these circumstances I feel that it was the duty of the court to go to the most reliable source of information, namely, the ballot boxes, in order to ascertain the facts. Public confidence in our institutions, indeed their very permanence, depends on the degree of honesty and accuracy with which elections are conducted. It is through the elective franchise that the will of the people is expressed and if the fraud or errors of election officers defeat their will popular government to that extent is a failure. Whenever a *prima facie* showing of such dereliction of duty is made to the court, as I believe was done in this case, I can conceive of no higher obligation that it is under to the community than to carefully inquire into the facts and declare its judgment.