JOHN C. LANE *v.* JOSEPH J. FERN.

## ELECTION CONTEST.

ARGUED NOVEMBER 29, 30, 1910.        DECIDED DECEMBER 6, 1910.

HARTWELL, C.J., PERRY AND DE BOLT, JJ.

ELECTIONS—*right to contest*

The right to contest an election is purely statutory. What constitutes a cause of contest is a question to be determined in accordance with the statutes of the jurisdiction in which the question is raised.

ELECTIONS—*question "as to the validity" of ballots.*

Whether a ballot marked and cast after five o'clock on the afternoon of election day, and whether a ballot wilfully exhibited by a voter to another, after marking and before casting it, should be rejected or counted by the inspectors are, within the meaning of section 56, Act 118, Laws of 1907, questions "as to the validity" of the ballot, within the power of the inspectors to decide and of this court to review on a contest under section 57 of that Act.

ELECTIONS—*what constitutes a "decision" by inspectors.*

The mere acceptance and the counting of ballots marked and cast after five o'clock on election day constitute "decisions" within the meaning of sections 56 and 57 of Act 118.

ELECTIONS—*Id.*

The mere acceptance and the counting of ballots exhibited to others by voters after marking and before casting them constitute "decisions" within the meaning of the sections named, at least if the exhibiting was seen by or known to the inspectors at the time of the occurrence or before such acceptance and counting, and perhaps, also, even if the exhibiting was not thus seen or known.

ELECTIONS—*what is a "question."*

The word "questions" used in section 56 of Act 118 does not refer to issues expressly raised at the polling place on election day by the candidates or their representatives, but to issues capable of being raised although not raised.

ELECTIONS—*causes of invalidity of ballots.*

The word "hereof" in subsection 5 of section 94, R. L., does not refer to the section itself but to all of the Rules and Regulations for Administering Oaths and Holding Elections promulgated by the president of the Republic in 1894 and now included in chap-

Lane v. Fern, 20 Haw. 290.

ters 7, 8 and 9, R. L. It refers not only to improper marks on the face of the ballot but also to other causes of invalidity.

ELECTIONS—*meaning of "decision."*

A "decision," within the meaning of sections 56 and 57, R. L., may be made, in proper cases, before as well as after the ballots are physically in the box.

ELECTIONS—*ballots cast after 5 p. m. valid.*

Ballots otherwise valid are not rendered invalid by the mere fact that they were prepared and cast between 5 p. m. and 6:30 p m. on election day.

ELECTIONS—*exhibited ballots invalid.*

Ballots wilfully exhibited to others by the voters after marking and before casting are invalid. Whether the inspectors and this court have jurisdiction to so determine (on a contest) with reference to ballots the exhibiting of which was not known to the inspectors, is not decided in this case.

## OPINION OF THE COURT BY PERRY, J.

### (HARTWELL, C.J., DISSENTING IN PART.)

Briefly summarized, and subject to qualifications hereinafter mentioned, the petition sets up three causes of contest: (1) that in a named precinct the polls were kept open until 6:30 o'clock on the evening of election day and that sixty-four ballots were marked, cast and accepted after five o'clock p. m.; (2) that while a large number of voters were in the polling house engaged in marking their ballots, or about to do so, one McCandless was present and handed pencils to numerous electors and by words and acts endeavored to influence the electors to vote for Fern, and that one Wolter was also present and "instructed" a number of electors "how to vote" and likewise by words and acts endeavored to influence the electors to vote for Fern; (3) that certain voters, their number not being stated, exhibited their ballots, presumably after marking them, to others, and that at times two or three electors were in the same compartment of the polling place marking ballots in plain view of each other. A further statement of the case is contained in the opinion of the chief justice. The demurrer presents two questions, among others, first whether up-

on the allegations of the petition the court is without jurisdiction to hear the contest, and, second, whether a cause of action is sufficiently set forth. In the view that we take it will be necessary to consider both of these grounds.

It is undoubted that the right to contest an election is purely statutory and must be determined in accordance with the statutes of the jurisdiction in which the question is raised. It is also true that the Hawaiian statutes on this general subject of contests have from time to time undergone change and that the powers of this court other, perhaps, than by writ of quo warranto, are not as extensive as they were at times in the past. Beyond this we have not found a study of the former statutes of much assistance. The question still remains, what are the present powers of this court under the statutes now in force? That is a question of construction.

This was an election held under Act 118 of the laws of 1907, "Incorporating the City and County of Honolulu." The direct source of the authority for the conduct of the election and for any contests arising under it is that act; and so also the source and the limits of our jurisdiction in this case are to be found in that act and in other acts by it made applicable. Section 40 of Act 118 provides that "The general laws and rules governing the election of senators and representatives of the Territory shall apply in the election of city and county officers, wherever applicable, except as herein provided." Those general laws and rules are to be found, in the main, in chapters 7, 8 and 9 of the Revised Laws. Sections 56 and 57 of Act 118 read as follows: "All questions as to the validity of any ballot cast at any election held under this Act shall be decided immediately and the opinion of the majority of the Board of Inspectors of Election at each polling precinct shall be final and binding, subject to revision by the Supreme Court of the Territory as hereinafter provided." "Any candidate directly interested, or any thirty duly qualified voters of any Election District may file a petition in the Supreme Court of the Ter-

ritory setting forth any cause or causes why the decision of any Board of Inspectors should be reversed, corrected or changed."

While petitioner contends to the contrary, it may be assumed for the purposes of this opinion that section 57, adding nothing in this respect to Section 56, grants no power to this court to consider questions which the inspectors could not have lawfully considered. It was so held in *Kanealii* v. *Hardy*, 17 Haw. 9, 12, the court saying, "And likewise the supreme court, in revising any such decision of a board of inspectors, could not consider questions which the board itself could not consider. Section 41" (Section 57) "limits the petition for such revision to causes for reversing, correcting or changing the decision of the board." This assumption is, in other words, that the "decision" mentioned in section 57 is the same decision, and no other, referred to in section 56. It may be assumed also, as is probably the case, that the decision contemplated in these two sections must be "as to the validity of any ballot" and not as to any other cause for invalidating an election, as, for example, not as to any defect in the nomination of the candidate nor as to the latter's eligibility. It may be assumed still further that the causes of invalidity cognizable by the inspectors are simply those mentioned in Sec. 94, R. L.,—although perhaps that view is not capable of as much support in the construction of section 56 as it would be in the case of the construction of section 95, the language of which, with the exception of the provision as to revision by the supreme court, is the same as that of section 56, for of section 95 it can be said, as it can not be said of section 56, that it is a part of the same act as section 94 and immediately follows it, whereas section 56 is in a separate statute and at first reading, at least, might not appear to be limited to section 94 by continuity of thought or expression. Nevertheless, with all of these assumptions, we think that the decisions of the inspectors, if decisions within the meaning of the statute were made (that sub-

ject is treated below), were "as to the validity of ballots," both with reference to the sixty-four cast after five o'clock and with reference to those which had been exhibited by voters.

Sec. 94, R. L., reads as follows: "If more names are voted for on a ballot than there are offices to be filled; or

"If on a ballot for representatives a larger number of votes are marked than the law authorizes; or

"If a ballot contains any mark or symbol whereby it may be identified, or any mark or symbol contrary to the provisions hereof; or

"If two or more ballots are found in the ballot box so folded together as to make it clearly evident that more than one ballot was put in by one person; or

"If a ballot in any other way be contrary to the provisions hereof; then such ballot and all it contains must be rejected.

"But no ballot shall be rejected for containing a less number of names voted for than the law authorizes.

"Each ballot which shall be held to be invalid as aforesaid shall be indorsed on the back by the chairman of inspectors, with his name or initials, and the word 'rejected'." This was originally section 108 (C. L., Appendix, p. 821) of Rules and Regulations for Administering Oaths and Holding Elections, promulgated by the president with the approval of the cabinet, under section 79 of the Constitution of the Republic. The word "hereof," in paragraph five of this section, clearly refers, as we think, not to the section itself, but to all of the rules and regulations so promulgated as one document, otherwise the words in the same paragraph "in any other way" become meaningless, for the "ways" of the paragraph itself are each and all specifically set forth. The expression "in any other way" was certainly intended to add to that specific list "ways" in which a ballot might be contrary to the provisions mentioned. Nor do we find ourselves able to construe this subdivision or paragraph as referring solely to defects on the face of the ballot itself, such as improperly placed crosses,

blots and marks of identification. Such markings and other physical defects on the paper itself had already been mentioned in that section. Ballots may be "contrary to the provisions hereof" for reasons other than improper marks or physical defects. A few illustrations may be of assistance. The Organic Act, in section 14, names a day in each two years when the regular election is to be held. If one or more ballots, otherwise valid, should, after midnight at the end of election day, be prepared and offered to inspectors to be deposited in the ballot box, would they not be invalid, and would it not, under section 94, be within the power and duty of inspectors to so decide and refuse to permit the voters to cast them? If in a precinct having in full operation a lawful polling place fifty voters, for whom lawfully prepared blank ballots had been surreptitiously secured, should mark the ballots in a saloon or other unauthorized place, and if shortly before closing time a box containing those fifty ballots should be presented to the inspectors at the lawful polling place with the request that the votes so furnished be counted, would not those votes, although in every way correctly marked, be invalid, and would not the inspectors be justified and required, if they did their duty, to then and there so adjudge and reject the attempted ballots? If ballots, in every other way regular, should be offered by women or by persons obviously minors would not the same action be proper and requisite? We cannot but think that these questions answer themselves. In each such instance the ballot would be "contrary to the provisions hereof." Not every piece of paper correct in color and apparently correct in form is a valid ballot. The time and the place of the marking and the casting, and the identity and the qualifications of the person offering it may all be, under the particular statutes in force, elements essential to rendering it a valid ballot.

In our opinion the fact that a ballot was prepared and cast after five o'clock presents an issue of validity or invalidity to be determined in view of the provisions of the statute. So also

does the fact that the voter (not disabled, under Sec. 89, R. L.), after marking his ballot, and before casting it, wilfully exhibits it to another. How these two questions of alleged invalidity should be determined, whether for or against the contentions of the petitioner, is a wholly distinct matter. Both were questions capable of being "decided" by the inspectors one way or the other under section 56 of Act 118.

But it is said that it does not appear from the petition that the inspectors made any "decision" concerning the ballots claimed to have been exhibited. Whether or not it can be held that there was a decision relating to the ballots the exhibiting of which was not seen by or known to the inspectors at or shortly after the exhibiting, need not be determined on this demurrer. It is a question which has not been argued and which may not arise at the trial. Since, however, the petition is held amendable in certain respects, it becomes necessary, in order not to encourage the petitioner to return into court with an amended petition simply to be then told that the court in no event has jurisdiction, to consider further whether there was a "decision" of the inspectors as to those ballots the exhibiting of which was thus seen by or known to them. In our opinion there was. The mere acceptance of the ballots with such knowledge and the subsequent counting of them constitute decisions. No formality is required or contemplated by the statute. There is no requirement that the determination be reduced to writing. No set words, written or oral, are necessary. No words at all are necessary. Acts speak louder than words, and what more effective can there be as an announcement of the conclusion reached than the acceptance or the rejection, as the case may be, of a ballot? For example, the statute at least appearing to contemplate a closing of the polls at five o'clock and the polls having been kept open until 6:30, could any one have been misled or left in ignorance, after the acceptance and counting of the sixty-four ballots, as to the decision of the inspectors that those ballots were valid? We think

not. The same is true of the acceptance and counting of the exhibited ballots, if the exhibiting was with the knowledge of the inspectors.

It may be said that the use of the word "cast" in the phrase in section 56, "all questions as to the validity of any ballot cast * * * shall be decided," shows an intent on the part of the legislature to confine decisions to ballots which are already in the box and excludes the legal possibility of a decision prior to the physical presence of the paper in the box. It seems to us that this position would not be sound. A ballot may be cast, within the meaning of this section, which is not yet physically in the box. It is cast when the voter has exhausted all reasonable efforts to have it placed in the box. Inspectors certainly are not compellable, closing their eyes to irregularity and to all glaring causes of invalidity, to accept every paper offered as a ballot and put it in the box. If a voter after receiving a blank ballot openly and defiantly leaves the polling place and marks his ballot outside at the dictation and in full view of a candidate, and then offers to place his ballot in the box, or if such offer be made by a person who admittedly has already cast on the same day a ballot in the same precinct, or by an alien, or by a woman, or by one indisputably a minor,—in every such instance inspectors may then and there "decide," within the meaning of the statute, that the ballot is invalid and may reject the same. That is one of the things that they are there for. The legislature so intended. It would be proper practice, undoubtedly, in such cases, for the inspectors after marking them for identification to set aside and preserve, for possible use in this court on a contest, all such ballots; but the fact remains, as we think, that the decision contemplated in the statute may take place before, as well as after, the physical presence of the paper in the box. The absence of any provision requiring the marking of rejected ballots for identification, whether such rejection takes place before or after the placing of the paper in the box, does not militate against this view. A "decision"

may be with reference to ballots which after as well as before the decision are unidentified and whether such lack of identification results from mistake, design or impossibility. Section 62 of Act 118 evidently contemplates the occurrence of cases such as these "where a correct result cannot be ascertained because of a mistake or fraud on the part of the inspectors."

The mere acceptance, therefore, of the ballot and the placing of it in the box, if done with knowledge of the exhibiting, was a decision within the meaning of the law and subject to revision by this court.

It is further said that there was no decision concerning the exhibited ballots because there was no "question" within the meaning of section 56. It will be recalled that that section provides that "all questions  *  *  *  shall be decided." The word "question" is ordinarily used in at least two senses, as denoting (1) an issue expressly raised by the parties to a judicial proceeding and to be determined by the court, and (2) an issue capable of being raised, although not raised. Both are familiar uses of the word. In which sense was it used here? We think the latter. All proceedings at polling places on election day are necessarily more or less informal. At times at least in the day there is great stress of work and but little time for formalities. Trained lawyers are not expected to take part in the conduct or watching of elections. In the great majority of cases the candidates and agents who attend to watch proceedings are without knowledge of the technical procedure required in courts to raise a question within the first meaning of the word above mentioned. No procedure is prescribed in the act for noting exceptions or for keeping a record of the raising of questions, this of itself indicating that questions in that sense were not contemplated by the legislature. No *right* is *secured* by the statute to watchers to examine ballots for improper marks, etc., before the making of a decision thereon by the inspectors. It would be unreasonable to hold, under the circumstances, that men who have no opportunity (what is

done by mere courtesy is immaterial) secured by the law of right to make such examination and to ascertain causes of invalidity must specifically raise questions or be thereafter barred from the right to a revision by the supreme court. If this is the correct view concerning defects on the face of the ballots it must be so also concerning other causes of invalidity. The word "question" must have one and the same definition in all instances. We can see no room for a distinction in that respect between one class of causes and another class, or any necessity or justification for requiring any more formal, more definite or different "question" concerning exhibited ballots than concerning any other ballots.

It would be impracticable, further, to hold that "questions" refers, in some classes of cases, to a mental state or process in the minds of the inspectors,—that it is essential, in other words, that the inspectors in counting each ballot observe the alleged ground of the invalidity. If it were so held, would a distinction be made, as to the power of this court to review, between markings which were observed by inspectors and markings which were not? Would it be made a question of fact, in each instance determinable upon the evidence of the inspectors? And how would the jurisdiction be affected, for example, by a failure of memory on the part of the inspectors as to whether or not they had at the time observed the possible defect?

In our opinion, by receiving and also by counting the ballots cast after five o'clock and the exhibited ballots, if with knowledge, the inspectors decided, favorably to the voters, the "question" of the possible invalidity of those ballots and those decisions are now "subject to revision" by this court under section 56, upon a petition duly filed under section 57.

Were the ballots cast after five o'clock invalid? R. L., Sec. 78, prescribes that "The polls shall be opened by the inspectors at 8 of the clock upon the morning of the election day, and shall be kept open continuously until 5 of the clock in the afternoon of said day, unless all of the registered voters of the precinct shall

have polled their votes previously to that time, after which the polls shall be closed and the votes counted as in this chapter provided." It may be noted in passing that while it is required that the polls be kept open until five o'clock, there is no express prohibition that they may not continue open after five o'clock. It is, indeed, provided that the votes shall be counted after five, but how much after or whether immediately after is not stated. It may be that it was not even an irregularity to receive the sixty-four votes, particularly if, as in *Kulike* v. *Fern*, 19 Haw. 278, the voters were all within the polling place before five o'clock. However that may be, and even if there was an irregularity the ballots were in our opinion not illegal. The provision is directory only. There is no penalty for its violation save such as may be found in chapter 9, relating to Offenses against Election Laws, by way of fine or imprisonment for the offending inspectors or, possibly, any one inciting them to the commission of the offense. There is no provision that votes cast after five o'clock shall not be received or shall be invalid. The object of the election was to obtain the free and untrammeled expression of the will of the voters concerning the choice of candidates for the office of mayor. There is no contention that this end was not accomplished. Voting after five o'clock and until 6:30 did not interfere with the desired expression of the voters' choice. We do not mean to say that cases may not occur of a violation of the statute in this respect so gross, as, for example, the receiving of votes after midnight, as to require declaring the votes so received, and perhaps the whole election, void. But this is not such a case.

The authorities on this subject are not in entire accord. The weight of reason is in support of the view just presented. While statutes differ in different jurisdictions, and while, therefore, not as much aid is to be derived from decisions elsewhere as might otherwise be the case, still a few quotations will not be out of place.

"If the law itself declares a specified irregularity to be fatal,

the courts will follow that command, irrespective of their views of the importance of the requirement. In the absence of such declaration, the judiciary will endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is held to vitiate the entire return; otherwise it is considered immaterial." *Bowers* v. *Smith,* 111 Mo. 45, 61, 62.

"Where there has been a fair and free expression of the popular will, a mere irregularity in conducting an election will not invalidate it." *Clark* v. *Leathers,* 5 S. W. (Ky.) 576, 578.

"But if, as in most cases, that statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election." McCrary, Elections, §225.

"It does not appear that these irregularities had any effect upon the voting, the counting or the returns, and consequently, for present purposes they are immaterial." *Lehlbach* v. *Haynes,* 54 N. J. L. 77, 81, 82.

"The particular hour in the day is not the essence of the thing required to be done. Should inspectors on a cloudy day, and misled by a defective timepiece, close the polls a few minutes *before* sundown, or receive a few votes *after* that hour, if the time of the day be of the essence of the thing, the whole election for that district would be void. I cannot subscribe to this doctrine. I think the statute is directory." *People* v. *Cook,* 8 N. Y. 67, 92, 93.

"A statute is to be regarded as directory merely if the directions given to accomplish a particular end may be violated and yet the given end be in fact accomplished, and the merits of the case unaffected, and this rule is applied where the statute gives directions as to the manner of holding elections; but the same rule cannot be applied to the constitution of the State." *Varney* v. *Justice,* 86 Ky. 596.

"It is the duty of the courts to uphold the law by sustaining elections thereunder that have resulted in a full and fair expression of the public will, and, from the current of authority,

the following may be stated as the approved rule: All provisions of the election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose; but after election, all should be held directory only, in support of the result, unless of a character to affect an obstruction of the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void."—*Jones* v. *State,* 153 Ind. 440, quoted and adopted in *Willis* v. *Kanealii,* 17 Haw. 243, 247.

See also McCrary on Elections, §227; *Cleland* v. *Porter,* 74 Ill. 76, 78, 79; *Patton* v. *Watkins,* 131 Ala. 387 (31 So. 93, 94); *Holland* v. *Davies,* 36 Ark. 446, 450; and *Fry* v. *Booth,* 19 O. St. 25, 27.

We think that the allegations in the petition concerning the receipt of votes cast after five o'clock are immaterial.

As to the ballots exhibited, Sections 87 and 88 of the Revised Laws read as follows. "No voter shall exhibit his ballot to any other person, nor shall any person look at or ask to see the contents of the ballot of any voter, except as provided in section 89; nor shall any person within the space set apart for a polling place attempt to influence a voter in regard to whom he shall vote for. When a voter is in the balloting compartment for the purpose of marking his ballot, no other person shall, except as provided in section 89, be allowed to enter the compartment or to be in a position from which he can observe how the voter is marking his ballot." "No person shall take a ballot out of the polling place; and if any person having received a ballot shall leave the polling place without first delivering the same to the inspector of election as provided in this chapter, or shall wilfully exhibit his ballot except as provided in section 89, after the same shall have been marked, he shall thereby forfeit his right to vote, and the

chairman of inspectors shall cause a record to be made of such proceeding." Differing from the subject of the time of the closing of the polls, this provision is express and unambiguous that a voter who shall wilfully exhibit his vote to another "shall thereby forfeit his right to vote." It is precisely as though the language were that the vote "shall not be counted" or "shall be invalid." The language is too clear for construction or argument. It is mandatory. The disregard of the provision may well, and ordinarily does, interfere with that free and untrammeled expression of the will of the voters which, as above noted, it is the main object of the law to secure. The secrecy of the ballot is an essential part of the whole scheme of our election laws. It is essential to its purity. It would be an undoubted incentive to bribery and fraud to have it known that a briber could call on the bribed to prove by exhibiting his ballot just before casting it that he was performing his part of the contract. This consideration, to be sure, would not confer jurisdiction on this court if none were otherwise conferred by the statute, but it tends to show, with other considerations, that the provision is mandatory and that its violation renders the ballot invalid, and that therefore, under paragraph five of section 94, the ballot is "contrary to the provisions hereof."

"Every positive requirement, therefore, which, if disobeyed, would necessarily defeat this object" (the secrecy of the ballot) "should be held mandatory." *Hall* v. *Schoenecke,* 128 Mo. 661, 669.

"I am aware that many cases may be cited in which powers relating to the method of conducting elections are held directory. But certainly the better authorities and the better reasoning do not justify the *counting* of a ballot which by the tenor of the act it is provided shall not be received." *Attorney General* v. *May,* 99 Mich. 538, 559.

See also McCrary, Elections, §227, and *Attorney General* v. *McQuade,* 94 Mich. 439, 440, 443.

It remains to be noted that under sections 87 and 88 the

exhibiting must be done *wilfully* in order to cause a forfeiture; that the exhibited vote must have been seen by another, a vote not being exhibited within the meaning of the law which is merely held so that another can see, who does not in fact see; that in order to support a cause of action there must have been fifty-two or more invalid votes; and perhaps, also, although upon this question no opinion is expressed, that in order to a "decision" concerning exhibited ballots the exhibiting must have been seen by or known to the inspectors at or shortly after the time of the occurrence. The reason for the requirement concerning fifty-two invalid votes is obvious. If the total number of invalid votes is less than the majority of the successful candidate it may well be assumed at the threshold that they were cast for the respondent, for the result of the election will still remain the same. *Swepston* v. *Barton,* 39 Ark. 549, 557. None of these matters mentioned in this paragraph are alleged in the petition. The petition, however, is capable of amendment as to all of them if the facts justify that course.

The alleged acts of McCandless and Wolter, in so far as they were contrary to the law, do not of themselves invalidate the election or any of the votes cast. The statutes do not so provide expressly and must therefore, within the rules above mentioned, be regarded as directory. The remedy, if any, is by fine or imprisonment under chapter 9 of the Revised Laws. It need scarcely be added that such conduct is highly reprehensible and ought to be punished if the law permits it.

In our opinion the demurrer should be sustained on the ground, not that the court is without jurisdiction, but that the facts averred do not constitute a statutory cause of contest, with liberty to the petitioner to amend within ten days if so advised.

*G. A. Davis, A. F. Judd, R. W. Breckons* and *G. S. Curry* for petitioner.

*W. W. Thayer* and *C. W. Ashford* for respondent.

Lane v. Fern, 20 Haw. 290.

OPINION BY HARTWELL, C.J., DISSENTING IN PART.

Petitioner, who was a candidate for the office of mayor of the City and County of Honolulu alleges that at the election held November 8, 1910, there were violations of the election laws in the sixth precinct of the fourth election district by reason of sixty-four electors having "voted after five o'clock and cast their ballots after five o'clock in the afternoon of the said day, whose ballots were counted by the election inspectors for the office of mayor," the petitioner claiming that those votes "were illegal and should not have been counted and returned," and that the "sixty-four voters had no right to vote after five o'clock in the afternoon," wherefore he claims all the ballots cast in the sixth precinct "were illegal and void and should not have been counted;" that after five o'clock in the afternoon of the election day there were over sixty people in the polling booth at said precinct "at one time and two or three electors about to cast their ballots and actually engaged in marking the same were in the same compartment in said polling booth talking to one another and marking their ballots in the presence of each other openly;" that Lincoln L. McCandless, candidate for the office of delegate to congress, was in the polling booth after five o'clock and handed "pencils to numerous electors for the purpose of marking their ballots and was trying to influence electors by words and acts to vote for" Fern (who has been officially declared to have been elected mayor), and that Wolter, a candidate for the office of representative of the fourth district, was in the booth and "instructed a large number of electors after five o'clock  *  *  *  how to vote and endeavoring by acts and words to influence certain electors in said polling booth to vote" for Fern for mayor, wherefore, as the petitioner claims, the votes cast in the sixth precinct were illegal and none of them should be counted and he "received a majority of twenty-six votes legally cast over the said Joseph J. Fern for the said office of mayor;" that between four o'clock and half-past five o'clock in the afternoon of the election day

"there were at all times two or three electors in each compartment of the polling booth marking their ballots together and in the presence of each other without secrecy, openly and in flagrant violation of law," and that by reason thereof the votes in that precinct, deposited in the ballot box for the office of mayor were illegally cast and that about sixty-four votes were so cast and illegally deposited in the ballot box and should have been rejected and not counted and that by reason thereof Lane received a majority of twenty-six of all the legal votes cast for the office of mayor; that the secrecy of the ballot was not observed nor the provisions of Sec. 87 R. L. (relating to secrecy of the ballot) carried out or followed in the polling booth of the sixth precinct where the election was being conducted, nor the provisions of Sec. 85 R. L. (as to method of voting) observed or followed from 2 p. m. until 6:30 p. m. of the election day; "that divers electors exhibited their ballots and marked the same openly in said polling booth, and divers electors marked their ballots two or three together in the same compartment at the same time." The petitioner prays that the finding and declaration of the election inspectors of the sixth precinct that Fern received 230 votes and the petitioner 150 votes be declared null and void; that the same be reversed; that it be adjudged that no legal votes were cast there and that all the ballots counted by the inspectors for the office of mayor be declared illegal, and that the total vote in that precinct be rejected and that upon proof of these allegations the court adjudge that the petitioner was elected to the office of mayor, and for such further order and relief as the circumstances of the case may require and as the law, pleadings and proofs shall warrant.

The petition alleges, and it appears by the annexed copies of tabulated returns, that 3206 votes were cast for Fern and 3154 for Lane, making a majority of 52 for Fern, and that of the votes cast in all other precincts than the sixth precinct Lane received a majority of 26.

Lane v. Fern, 20 Haw. 290.

The respondent demurred to the petition on the ground that it does not show that the court has jurisdiction of the subject matter thereof and does show that the court is without jurisdiction in the premises; that the petition is indefinite and insufficient in failing to set forth facts or circumstances rendering it probable prima facie that sufficient of the alleged illegal votes were cast for the respondent to invalidate or change the result of the election or that the sixty-four votes were not cast for the petitioner and hence did not change the result of the election; that the petition does not show that any votes were illegally cast or that the alleged illegal course at the election in anywise influenced its result, and that the relief prayed for is not authorized by any law of Hawaii.

The petitioner's motion to dismiss the demurrer as not authorized by the statute relating to election contests was denied and the demurrer was argued.

Sec. 57 of Act 118, S. L. 1907, entitled "An Act to Incorporate the City and County of Honolulu," reads as follows:

"Any candidate directly interested, or any thirty duly qualified voters of any Election District may file a petition in the Supreme Court of the Territory setting forth any cause or causes why the decision of any Board of Inspectors should be reversed, corrected or changed."

It is claimed by the petitioner that the case presented in his petition is properly brought under the provisions of Sec. 57 above quoted; and that the "cause or causes" for reversing "the decision of any Board of Inspectors" include not only decisions by the inspectors upon the validity of ballots, in rejecting ballots not in accordance with the requirements of Sec. 94 R. L., but also their action in counting ballots cast after five o'clock and allowing the violations of the election laws alleged in the petition.

The respondent's contention is that the provisions of Sec. 57 refer to those of Sec. 56, or, as he puts it, that Sec. 57 is the complement of Sec. 56. Sec. 56 reads as follows:

"All questions as to the validity of any ballot cast at any election held under this Act shall be decided immediately and the opinion of the majority of the Board of Inspectors of Election at each polling precinct shall be final and binding, subject to revision by the Supreme Court of the Territory as hereinafter provided."

The respondent insits that none of the alleged violations of the election laws, whether on the part of unauthorized persons in the polling booth or of the inspectors in keeping the polling booth open after five o'clock and allowing votes cast after that hour to be counted, were decisions by the board of inspectors on any "questions as to the validity of any ballot."

There is much diversity in the statutory causes for which elections may be contested in the several states. In California, for instance, a contest may be made for "malconduct" and not merely for express violations of the election laws on the part of any judge of elections and also "on account of illegal votes." The California Code of Civil Procedure is as follows:

"TITLE II. Of Contesting Certain Elections. §1111 Who may Contest, and Grounds of Contest. Any elector of a county, city and county, city or any political subdivision of either, may contest the right of any person declared elected to an office to be exercised therein, for any of the following causes:

"1. For malconduct on the part of the board of judges, or any member thereof.

"2. When the person whose right to the office is contested was not, at the time of the election, eligible to such office.

"3. When the person whose right is contested has given to any elector or inspector, judge, or clerk of the election, any bribe or reward, or has offered any such bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in title four, part one, of the Penal Code.

"4. On account of illegal votes."

Under this law, since neither voters nor candidates have any control over election officers, and to upset elections because such

officers have failed strictly to comply with the law, as in matters relating to arrangement of polling places, would be to encourage irregularities committed for the very purpose of invalidating an election, an election is not invalidated by reason of such non-compliance with the requirements of the election law. *Hayes* v. *Kirkwood,* 136 Cal. 396. An entire vote of ward or of city should not be rejected for malconduct of the election board when it appears that everything was done in good faith and that no fraud was committed. *Atkinson* v. *Lorbeer,* 111 Cal. 419. The fact that a candidate wrongfully procured his nomination or had his name illegally placed upon tickets is not ground for contest under the law quoted. *Powers* v. *Hitchcock,* 129 Cal. 325. Aiding and abetting a registering officer in the illegal registry of voters does not constitute ground for contesting an election. *Meredith* v. *Christy,* 64 Cal. 95. It is not cause for an election contest that the candidate declared elected had not complied with the purity of election law. *Treanor* v. *Williams,* 145 Cal. 315.

Hawaiian legislation upon election contests has undergone many changes. During the time when only representatives were elected and, under the constitution of 1852, the legislature sat in separate houses of nobles and representatives, whenever fifty or more of the voters of any district should petition the house setting forth that any person chosen as representative for the district had "been elected through bribery or any other unfair means, or that he is not qualified according to law," the house was required to institute an inquiry as to the truth of the charges and if they found them to be true to "immediately declare his election null and void." Sec. 796 C. C. The constitution of 1887, which retained the single house legislature, under the constitution of 1864, consisting of nobles and representatives sitting together, in Art. 58, made the nobles elective.

In Act 76, S. L. 1888, amending and consolidating the election laws of the Kingdom, introducing the Australian ballot law, are the following provisions for annulling elections and

vacating seats of elective members: It is declared in Sec. 75
that the seat of any· elective member of the legislature should
become vacant if he should die, resign or be convicted of any
of the offenses disqualifying persons from being elected or of a
violation of any of the provisions of the act, as well as for
bribery, fraud, miscarriage or default of the member or of his
agent whereby his election might be vitiated, and in Sec. 76
that upon petition of not less than thirty voters of the district
in which there was an alleged vacancy setting forth "any cause
or causes alleged for such vacancy," the legislature should ex-
amine the question of the vacancy or dispute thereon and take
full evidence "on all matters pertaining thereto" and if it found
the seat vacant or that it ought to be so declared a new election
should immediately be ordered by the Minister of the Interior
on notice of such vacancy from the President of the Legisla-
ture." Sec. 78 provides for proceedings in court for annulling
elections· that: "In addition to the methods hereinbefore set
forth for vacating any seat in the Legislature, any candidate,
or any ten persons who have voted or were entitled to vote in
the district, may file a petition addressed to the Chief Justice
of the Supreme Court, setting forth any cause of causes, why
an election shall be vacated or a seat be declared vacant." Sec.
80 declares that at the hearing the justice "shall cause the evi-
dence to be reduced to writing in full or sufficiently to ascer-
tain all of the facts involved, and shall thereupon give judg-
ment, stating all of his findings of fact and the law thereupon,
which shall then be transmitted in full to the Minister of the
Interior, provided no appeal shall be taken. If such finding
shall be that the election was invalid, and the seat therefore
vacant, a new election shall at once be ordered." This law
enumerates in Sec. 75 the causes of vacating the seat of any
elective member of the legislature. Under Sec. 78 the petition
may set forth "any cause or causes."

It is unnecessary for the purpose of the present case to say
whether under that statute an election could be vacated for any

"cause or causes" not therein enumerated. The act makes no other provisions for correcting decisions of inspectors as to the validity of ballots, but provides, Sec. 62: "All questions as to the validity of any ballot shall be decided immediately, and the opinion of a majority of the Inspectors shall be final and binding, except as hereinafter provided."

Act 86 S. L. 1890, amending and consolidating the election laws of the Kingdom, contains in Sec. 87 the same provisions for proceedings in court for vacating elections, with the amendment that "The hearing may be had before any Justice of the Supreme Court and shall be held in the judicial circuit wherein the election is disputed," and further providing that the court should "have no jurisdiction over any such case during the session of the legislature."

The constitution of 1894 (Art. 38), vesting the legislative power of the Republic in a legislature consisting of two houses styled the senate and house of representatives, sitting separately, provides (Art. 40): "In case any election to a seat in either House is disputed, and legally contested, the Supreme Court shall be the sole judge of whether or not a legal election for such seat has been held; and, if it shall find that a legal election has been held, it shall be the sole judge of who has been elected." It will be observed that the power is very great under this article and authorizes the supreme court to determine generally whether an election is legal or not.

Act 8 of the Laws of the Republic of Hawaii, relating to elections and contested seats in the legislature, enumerates in Sec. 7, the causes for which the seat of any elective member of the legislature shall become vacant, being substantially the same as those enumerated in the former law, and provides in Sec. 8: "Any candidate directly interested, or any thirty duly qualified voters of any election district, may file a petition in the Supreme Court, setting forth any cause or causes why an election shall be declared void, or a seat in the Legislature vacant, or the decision of any Board of Inspectors, or of the Marshal

or any Sheriff, reversed or changed." Sec. 12 provides that if at a hearing of such petition the "finding shall be that the election was invalid or the seat vacant a new election shall at once be ordered."

In none of the laws cited was there any authority for the court to declare who was elected, its power being confined to declaring an election void in any of the cases enumerated.

By the Organic Act the legislature passes upon the qualifications of its members and by implication the supreme court could not take jurisdiction of any petition to declare void the election of a senator or representative or to determine what candidate was legally elected. Act 39 S. L. 1905, commonly referred to as the County Act, as well as Act 118 S. L. 1907, incorporating the City and County of Honolulu, contains only that portion of the above cited laws which authorizes this court to hear petitions in contested elections to reverse, correct or change the decision of any board of inspectors on "questions as to the validity of any ballot."

The legislature has not granted to this court the authority to declare elections void for illegal acts other than are shown in inspectors' decisions upon the validity of ballots, and those are the only decisions which can be reversed or changed in a proceeding brought under Sec. 57, Act 118, S. L. 1907. The petitioner does not aver in his petition that any such question came before the board for its decision or was decided, unless counting the sixty-four ballots cast after five o'clock is a decision, in the absence of any question raised, that those ballots were valid.

But it is conceded in argument by the petitioner that the "questions" for the board of inspectors to pass upon in reference to the "validity of any ballot" are confined to the provisions of Sec. 94 R. L. (Sec. 108, Ap. C. L.), reading as follows:

"Rejected ballots. If more names are voted for on a ballot than there are offices to be filled; or,

"If on a ballot for representatives a larger number of votes are marked than the law authorizes; or,

"If a ballot contains any mark or symbol whereby it may be identified, or any mark or symbol contrary to the provisions hereof; or,

"If two or more ballots are found in the ballot box so folded together as to make it clearly evident that more than one ballot was put in by one person; or,

"If a ballot in any other way be contrary to the provisions hereof; then such ballot and all it contains must be rejected.

"But no ballot shall be rejected for containing a less number of names voted than the law authorizes.

"Each ballot which shall be held to be invalid as aforesaid shall be indorsed on the back by the chairman of inspectors, with his name or initials, and the word 'rejected.'"

It is apparent that this section only is referred to in the following section:

"Sec. 95. Validity of ballot decided immediately. All questions as to the validity of any ballot shall be decided immediately, and the opinion of a majority of the inspectors shall be final and binding."

It is true that by Sec. 40 of Act 118 S. L. 1907, "The general laws and rules governing an election of senators and representatives of the Territory shall apply in the election of city and county officers, wherever applicable, except as herein provided," but these laws and rules governing such elections, if they had not been repealed expressly or by implication, as they have been, would not authorize this court to hear any election contests other than those which are provided for in Act 118. *In re Contested Election,* 15 Haw. 323, 332.

No question then is presented in this case upon any of the matters referred to in Sec. 94, and while the term "illegal votes" or "illegal ballots" is frequently used to include votes or ballots cast by a person disqualified to vote or who has been illegally induced by bribes or intimidated, a ballot which is legal in form and legally marked before five o'clock is equally a legal ballot after five o'clock and does not become illegal merely because it is cast after that hour. The validity of the

ballot requires that it be in the form required and that it be marked by the voter in accordance with the requirement of the statute and not otherwise. A question of the validity of the ballot is not involved in the inspectors' duty, if such be their duty, to close the polls at five o'clock. If any wrong is done or mistake made by them in keeping open longer it might come under the head of "malconduct" and be the cause of contest under such statutes as those of California, above cited. Giving the broadest scope then to our statute and assuming solely for the purpose of this case, and not as a precedent for future cases, that it was unnecessary that any question should be presented for the inspectors to pass upon concerning the validity of the ballots but that their mere act of counting ballots is to be treated as a decision, still it is clear that a case, such as is authorized by the statute, is not presented by the petitioner. Nothing is gained by considering decisions made elsewhere under statutes unlike our own.

"The diversity of state legislation upon the subject renders the local decisions of one state of little aid in construing the election laws of another. Each act must be viewed in the light of the legislative will, as expressed, and hence the citations of authorities by appellee under the particular enactments of different states, such as California and Pennsylvania, are inapplicable here. *Bull* v. *Southwick,* 2 Gildersleeve (N. M.) 321, 340.

Thus the case from 125 Cal. 16, relied on by the petitioner, was brought under a statute similar to our quo warranto, as amended by the act of 1907, authorizing actions for usurpation of an office and authorizing the court to determine whether the incumbent of the office held it lawfully or unlawfully. The only question in that case argued by counsel or discussed by the court was whether at the election of the mayor of San Francisco the polls had been legally closed in two of the city wards at five o'clock, as required by the general state law, or, as was done in the other wards, at sundown, as required by the mayor's proclamation issued under an ordinance claimed to

have been authorized by the city charter. The court, holding that the charter authorized the ordinance and therefore that sundown was the correct hour for closing the polls, necessarily held that the election was invalid in the wards in which the polls were closed at five o'clock.

In Kentucky the law appears to authorize the court to annul an election if it is illegal; and it was held in the cases cited from 86 Ky. 596, and 104 Ky. 842, relied upon by the petitioner, that keeping the polls open long after sundown, the time required by the constitution, in connection in the second of these cases with other grave violations of the elections laws, made the elections illegal.

On the other hand, the considerable number of decisions cited by the respondent, that non-compliance with statutory requirements do not invalidate an election on the ground that no harm was done or that the statutory requirements were merely directory, have no bearing upon the present case which rests upon the lack of judicial power, on any of the grounds named in the petition, to annul an election or to declare who was elected.

As held in *Ellingham* v. *Mount,* 43 N. J. L. 470, 473:

"These proceedings calling in question this election, were instituted by the authority of the provisions of the election law embraced under the ninth head, which relates to contested elections of county and township officers. Rev., p. 355. The entire remedy thus given is a statutory device, and no part of it has any existence outside of this enactment; and, upon inspection, it will be found that the extent of this remedy has been carefully defined. The act, plainly, does not give this method of redress in every case in which an illegal election has occurred. If such had been the design, judicial jurisdiction over the subject would have been given in general terms; but, so far is this from having been done, the grounds of such jurisdiction are carefully specified and described; such grounds being distributed under seven distinct heads."

"The statute enumerates the causes for which an election may be put in contest by force of its provisions, and conse-

quently an election cannot be called in question in such a procedure except for one of the causes so designated."

In *Clarke* v. *Rogers,* 81 Ky. 43, it was held that the statute having provided the means of contesting elections "where no provision has been made applicable to the particular case, the result, as certified by those holding the election, must determine the issue."

To summarize: The petition alleges violation of election laws on the part of voters in showing their ballots by marking them so that the marks could be seen by another on the side of the polling booth or in company with another voter in the voting compartments, contrary to the provisions of Secs. 87, 88, R. L., whereby, if the exhibition of the ballot is "wilful," such voter, by Sec. 88 R. L., "shall forfeit his right to vote;" and on the part of the board of inspectors in permitting more persons than are authorized by the statute, Sec. 79 R. L., to be within the space around the polling place set apart in order to prevent interference with the conduct of the election, and in keeping the polls open for about an hour after five o'clock and counting the ballots, about sixty-four in number, cast in that time by voters who had voted after that hour, Sec. 78 R. L. prescribing that the polls be kept open until five o'clock, unless all the voters registered in the precinct shall have voted sooner, "after which the polls shall be closed and the votes counted."

No question is presented as to the invalidity of any ballot for noncompliance with the provisions of Sec. 94 R. L. in any of the ways therein enumerated or in any other way contrary to the provisions of that section, in any of which cases the inspectors are required to mark "rejected" on the ballots.

The court being agreed that no cause of contest is shown by the action of the inspectors in keeping the polls open and counting the votes cast after five o'clock, the only question on which the court has not agreed is upon the necessity of a decision upon the validity of ballots cast by voters who had wil-

fully exhibited them. If acceptance and counting of such ballots were regarded as deciding that they are valid, and if the inspectors have not set the ballots apart for identification in order that their decision may be reviewed in a contest upon its correctness, then in every such instance, and whether the inspectors were right or wrong, as those ballots are not before us, it would be impossible to take evidence of the voter or of others of the exhibiting or of its wilfulness, for it may be done innocently and others may not have seen the names voted on the ballot.

Hence the necessity of a decision being made, however informally, by the insptctors upon a question as to the validity of any ballot cast at an election if a contest is to be made upon the correctness of the decision. Whether the question of the validity of any ballot be presented when it is presented or after the polls are closed, it is ballots which are 'cast' to which the decision of the board of inspectors relates.

If ballots are accepted and counted without objection, and perhaps without the attention of more than one inspector having been drawn to the fact that they were marked so that others might, and perhaps did, see the marks, or if he thought there was no exhibition of the ballots, or none wilfully made, there would be no decision on the subject made by the board, and no contest on the decision could be made.

If violations of election laws by inspectors, voters, candidates or others make an election illegal, it might be so decided in quo warranto proceedings in which the court passes upon the seriousness of the violations of law from their possible effect upon the election or upon the law being mandatory, whatever the result of its violation, but not on a contest upon decisions of inspectors which have not been made and to which the statute authorizing election contests does not refer. The effect of this conclusion on future elections will perhaps be that the inspectors, voters and candidate will be more alert

Lane v. Fern, 20 Haw. 290.

and observe the requirements of the law and any violations thereof.

I agree that this case is not to be decided on "technicalities," a term often used for refinements of law, but on the broad and only safe ground for any judicial tribunal to take, namely, that, as I think, the law does not authorize the case to be heard or decided on any of the grounds named in the petition. To decide otherwise would be to usurp legislative functions,—a thing which is abhorrent to free institutions. No matter how urgent the demand for the exercise by the court of authority not granted to it by the legislature, the answer must be, the court declares and does not make the law.

I agree that the demurrer should be sustained and the petition dismissed on the grounds named in the opinion of the majority, but I also think that for the reasons above named there was no decision in fact or substance of any ballots having been wilfully exhibited, and that the demurrer ought to be sustained on that ground also. In that respect only I non-concur with the opinion of the court.